Duer, J.
The provisions of the statute, upon reading them, appear sufficiently clear, but as the question now raised, as to their construction, is of considerable importance, we shall take time to consider it. The defendants must, therefore, be recognised to appear again on Tuesday next (March 1st), and must then be prepared to answer the interrogatories, if we shall hold them to be relevant.
March 1st. Dube, J.—I retain the opinion that the construction of the statute, under which these proceedings are had, is free from any reasonable doubt. (2 R. S., tit. 13, chap. 8, part 3, p. 534.) It is true, the statute is entitled, “ Of proceedings, as for contempts, to enforce civil remedies, and to protect the rights of parties in civil actionsand it is also true, that the court can pronounce no judgment at all unless it appears that the misconduct of the defendant “ was calculated to, or actually did, defeat, impair, impede, or prejudice the rights or remedies” of the relator in a pending action. (§ 20, 2 R. S. 538.) And'it is from these circumstances that the argument which has been addressed to us on behalf of the defendants, who have excepted to the fifth and sixth interrogatories, derives all its plausibility. It is evident, however, from other provisions in the statute, that the court may impose a penalty, even when no indemnity, beyond his costs and expenses, is due to the party *517 aggrieved. When the relator is shown to have sustained an actual loss, he must he indemnified by the imposition of a fine equal to the extent of his loss, in addition to his costs and expenses (§ 21); but in cases where no actual loss is proved, the court may, in its discretion, impose a fine not exceeding $250, beyond costs and expenses (§ 22); and may inlprison the defendant for “ a reasonable time, not exceeding six months (§ 25); and in such cases, neither the fine nor the imprisonment can have any object other than punishment. Hence, to enable the court, in these cases, to exercise properly its discretion, an inquiry into all the circumstances that may define the misconduct of the defendant, as criminal or excusable, is not only relevant, but necessary. I shall not pursue these remarks, since Mr. Justice Bosworth has prepared an advisory opinion, in which the provisions of the statute, and prior decisions bearing on their construction, are carefully and fully examined, and this opinion I adopt as that of the court.
Bosworth, J.
The specific question tinder consideration is, shall the defendants be required to answer the fifth and sixth interrogatories? This proceeding is based on an allegation, that the defendants have disobeyed an injunction order made by a judge of the court, in an action pending therein. The papers on which the attachment was issued, allege that the defendants, members of the Board of Aldermen, in addition to disobeying the order, voted for a certain preamble and resolutions relating to the issuing of the injunction, and the acts prohibited by it, and professing to state the grounds on which they assumed to disobey it. The fifth and sixth interrogatories call upon them to answer whether they did not vote for such preamble and resolutions ? and whether by such votes they were not adopted by the board of which they were severally then members? To determine whether they should be required to answer, it is necessary to look at the nature of the present proceeding ; the ends that may properly be accomplished by it; and whether the fact of having voted, or having omitted to vote for such preamble and resolution, is one that can legitimately be taken into consideration in the final disposition of this matter, and which can justly affect the ultimate decision.
The Code provides, that the order which has been disobeyed, *518 may be enforced as the order of “ the court.” (Code, sec. 218.) Section 471 declares, that until the Legislature otherwise provides, the Code “-shall not affect any proceedings provided for by ” chapter 8, of the third part of the Revised Statutes, excluding the second and twelfth titles thereof, unless some provision thereof is plainly inconsistent with the Code, and that any such provision shall be deemed repealed. These proceedings are instituted under the thirteenth title of that chapter of the Revised Statutes. The provisions of the Revised Statutes must, therefore, furnish a solution of the question under consideration. They provide that “ every court of record shall have" power to punish, as for a criminal contempt,” persons guilty of certain acts; and among others, “ wilful disobedience of any process or order lawfully issued or made by it.” (2 R. S. 278, sec. 20, sub. 4.) This class of contempts may be punished by a line not exceeding two hundred and fifty dollars, and by imprisonment not exceeding thirty days. This punishment may be inflicted irrespective of the consideration of any injury done to a party to the action in which .the process was issued, or the order made, and is to be fixed irrespective of any_ such consideration. For all contempts of this character, the offending party may be indicted (2 R. S. 692, § 14), as for a misdemeanor. If subsequently indicted, the court before which a conviction is had, on such indictment, is required, in forming its sentence, to take into consideration the punishment before inflicted, in the proceedings as for a criminal contempt. (2 R. S. 278, § 14.) The revisors, in their notes upon this title (tit. 2, of chap. 3, of part 3,) remark, that a “ solid and obvious distinction exists between contempts, strictly such, and those offences which go by that name, but which are punished as contempts only for the purpose of enforcing some civil remedy. This distinction has been observed, and the former are intended to be included in the preceding sections. , The latter class are treated of subsequently, among miscellaneous proceedings in civil cases.” (3 R. S. 695, foot of the page.) The statute in relation to the latter class (2 R. S. 534, § 1) provides, “ that every court of record shall have power to punish, by fine and imprisonment, or either, -any neglect or violation of duty, or any misconduct, by which the rights or remedies of a party in a cause or matter depending in *519 such court, may be defeated, impaired, impeded, or prejudiced in certain specified cases; and among others, “ for disobedience of any process of such court, or of any lawful order thereof, or of any lawful order of a judge of such court.” It will be noted, that the expression here used, is “ for disobedience” of a lawful order, omitting the word “ wilful.” To punish as for a criminal contempt, there must have been a “ wilful disobedience.” (2 R. S. 218, § 10, sub. 3.) Although the disobedience was not wilful, a party offending may be punished in the cases prescribed in 2 R. S. 534, § 1, if his neglect of duty was such that, by it, the rights or remedies of a party to a cause might be defeated, impaired, impeded, or prejudiced. But although in such a case, the disobedience might have resulted from a misapprehension of duty, or from the advice of counsel, honestly given, and implicitly believed, that the act which the law adjudges to be disobedience was not prohibited, yet the disobedience may have been wilful, and have been accompanied with such acts and circumstances as would show a purpose to make the- disobedience studiously offensive to the court, and to publicly manifest by it a contemptuous disregard of its order and authority. If the latter should be the true nature and character of the act of disobedience, is it to be overlooked, and are all interrogatories calling for answers that might establish it, to be suppressed ? The 20th section declares, that if the court adjudges the defendant to have been guilty of the misconduct alleged, and that “ it was calculated to or actually did” produce certain results, “ it shall proceed to impose a fine, or to imprison him, or both, as the nature of the case shall require.” If actual loss has been produced, a fine shall be imposed, that will indemnify the party, and satisfy his costs and expenses (sec. 21). -The statute is imperative, that in case of actual loss, a fine sufficient to indemnify and to satisfy costs and expenses, must be imposed. In all other cases, that is, in those cases in which no actual loss is shown, but in which it is adjudged that the act of disobedience was calculated to defeat, impair, impede, or prejudice the rights or remedies of any party, the fine shall not exceed $250 over and above the costs and expenses of the proceedings (sec. 22). For what, it may be asked, is this fine to be imposed in a case in which no actual loss has been sustained ? and by what con *520 siderations is a court to "be governed in properly determining whether it shall be $1 or $250 ? This question can be more advisedly answered on a reference to other provisions of' this statute.
It will be noted that séctions 21 and 22 speak only of the fine to be imposed, and nothing in relation to the imprisonment. Section 20 gives the power to fine and imprison. Sections 23 and 24 relate to the matter of imprisonment, and embrace two classes of cases. The 23d regulates the extent of the imprisonment, where the misconduct complained of consists in the omission to perform some act or duty which it is still in'the power of the offending party to perform; and provides that, in such cases, he shall be imprisoned only until he shall have performed such act or duty, and paid such fine as shall be imposed, and the costs and expenses of the proceedings. In such a case, the order and process of commitment must specify the act to be done, and the amount of fine and expenses to be paid. If able to pay the latter, the term of his imprisonment will depend exclusively on his own volition; for when he has paid the fine and expenses, and done the act, or performed the duty, it will terminate, and he will be entitled to a discharge.
In all other cases; that is, in all cases except those in which the misconduct alleged consists in the omission to perform some act or duty, .which it is yet in the power of the defendant to perform, he may be punished' by imprisonment, “ for some reasonable time, not exceeding six months,” and until the expenses of the proceedings are paid; and also, if a fine be imposed, until such fine be paid, (ib. § 25.) The power to punish by imprisonment, conferred by section 20, so far as the imprisonment is ordered by way of punishment, is limited by section 25, to six months; but if the fine and expenses are not paid, it would last through life but for the act of 1843, chapter 9. This limitation of the power to imprison for a period not exceeding six months, has no connexion with the imprisonment ordered to compel the payment of the fine imposed, and of the costs and expenses of the proceedings. For if the power to punish by imprisonment in this class of cases, is a power to be exercised for the sole purpose of compelling payment of the fine and expenses, then it would follow—as a limit *521 is set to the power to imprison, and the imprisonment cannot exceed six months—that at the end of that period, the offending party must be discharged from imprisonment, whether the fine and expenses are paid or not. Yet, independent of the express language of the statute, that where the punishment adjudged is merely a fine and payment of the expenses, the imprisonment must continue until they are paid, it has been uniformly held that no power was competent to determine it short of that period, and hence the act of 1843 (chap. 9) was passed, authorizing a discharge on proof of inability to do the things required. The imprisonment authorized by section 25, within the limit of six months, if imposed at all, is by way of punishment, and must be endured, even though the fine and expenses be paid the moment the decision is made. Tins imprisonment for a reasonable time, not exceeding six months, may be imposed in every case in which the misconduct alleged calls for it, except in the cases specified in section 23. In that class of cases, the misconduct or disobedience consists in not having acted at all—in all others, in having' actually done something prohibited. It may be thought singular, that, in the case of a criminal contempt, and in punishing it as such, the power to imprison should be restricted to thirty days; and that in proceeding to punish as for a contempt, injuries to civil rights, the power to imprison for a longer period should have been conferred. Yet the revisors, in their notes to sections 23 to 25 of 2 R. S. 538, make this comment:—“ In cases of criminal contempt, by sec. 11, title 2, of chap. 3, of this part, the imprisonment is limited to thirty days. Perhaps there may be cases where a longer imprisonment for injuries to civil rights, ought to be allowed.” These three sections were enacted in the form in which they were proposed (3 R. S. 773, 2d ed.). If, then, a fine may be imposed as a punishment, where no actual loss has been occasioned by the disobedience ; if imprisonment not exceeding six months may be ordered with the same view; if the imprisonment, when ordered, isx to be for only a reasonable period, it is obvious that some principle exists, by which the court ought to be guided in discriminating between cases, and by which in-some it may properly fine to the extent of $250, while in others the fine *522 should be nominal only, and by which it may determine whether imprisonment should be ordered as a punishment, and what term would be a reasonable period in any particular case. The reported cases show, that courts have regarded it as free from doubt, that the nature of the disobedience, as whether it was wilful or otherwise, was one of the matters to be regarded in determining whether any and what punishment should be inflicted beyond the imposition of a fine sufficient to indemnify an injured party for his loss and to satisfy his expenses. In Hawley v. Bennett, 4 Paige, 164; the Chancellor said, “ that so far as the rights of a party have been affected by the breach of an injunction, it is no defence to the person who has been guilty, of violating the same, that he did it under the advice of counsel; although, if he has acted in good faith, it may be sufficient to protect him from punishment as for a criminal contempt.” In Rogers v. Paterson, 4 Paige, 456, the Chancellor restated the principle, thus: “ And the advice of counsel cannot protect a party in disobeying an order of the court, so as to prevent the adverse party, whose remedy is impaired or impeded by such disobedience, from taking the necessary steps to compel a compliance with the order; although the fact that the party has acted in good faith, and under the advice of his counsel, may be sufficient to prevent the imposition'of a fine beyond the actual amount of the injury sustained by the adverse party, and the necessary expenses of the proceedings.”
In Sullivan v. Judah, 4 Paige, 447, he said, “ In this case, it is evident that the complainant has sustained no injury by the proceedings of the defendants, although they have proceeded in direct opposition to the injunction. . And the excuse offered by them, is sufficient to prevent the imposition of any considerable fine as a punishment for contemning the process of the court.”
In Lansing v. Eaton, 7 Paige, 367, he remarked that, “ The fact that the defendants acted under the erroneous advice of counsel, to whom they applied for information, how they could elude the justice of this court, and, at the same time, avoid punishment for a breach of the injunction, cannot protect them from a fine sufficient to compensate the adverse parties for the 'injuries they have sustained'by the wrongful acts complained *523 of; though it may furnish a ground to justify the court, in refusing to inflict a further punishment upon the offenders for a violation of its order.”
In the Albany City Bank vs. Schermerhorn, 9 Paige, 379, in which the Chancellor, on appeal, reversed a Vice-Chancellor’s order, adjudging parties guilty of a contempt, he stated that an order of conviction should direct “ to whom the tine is to he paid, or what is to be done with such fine when paid, &c., so that the order, and the process of commitment founded thereon; may show the nature of the conviction, and what the defendant is to do to entitle himself to a discharge from imprisonment.”
In the People ex rel. Backus vs. Spalding, 10 Paige, 284, the report of the case shows that Spalding had been convicted, by a Vice-Chancellor, of a wilful breach of an injunction issued by a creditor’s bill filed against him. After he had been committed, he was discharged by a Supreme Court commission, in proceedings under a habeas corpus. The Vice-Chancellor made an order for a re-commitment, on the ground that the commissioner had no jurisdiction in that case to order his discharge. From the order re-committing him, Spalding appealed to the Chancellor, who affirmed the order. An appeal was taken to the court for the Correction of Errors. That court affirmed the judgment of the Chancellor.
Chief Justice Kelson, in delivering the opinion of the court, remarked, that “ the act, for which the appellant had thus been adjudged guilty, is a criminal offence under the revised statutes, and was so before at the common law, subjecting the offender to indictment; and, on conviction, to fine and imprisonment.” (2 R. S. 692, § 14, ib. 697 ; 4 Bl. Comm. 139.) “ In cases confessedly criminal and indictable, the penalties for which would ordinarily go for the benefit of the people, the courts are authorized to impose a fine, with a view to the indemnity of the party aggrieved, his acceptance of it being declared a bar to any private action for the injury. The fine, however, is no less a penalty for a criminal act, than if inflicted for the benefit of the people; but the imposition of it in the way prescribed, accomplishes the double purpose of punishment for the misconduct on the one hand, and indemnity to the aggrieved party on the other.” (7 Hill, 301.) In that case, *524 the court below adjudged, that an actual loss had been occasioned by the disobedience; and although the reports ot the case show that he was fined for the contempt to the amount of $3,000, and the costs and expenses in relation to the contempt to the amount of $196 51, it does not appear how much was due on the judgment on which the creditor’s bill was filed. The order of conviction directed the costs to be paid to the solicitor of the relator, and the $3,000 to be paid to the clerk of the court, subject to the further order of the court. (4 How. S. C. R. (H. S.) 21.) In that case, Spalding was adjudged, on the 21st of March, 1842, to have wilfully violated the injunction. On the 7th of May, 1842, he was arrested on an alias mittimus; and continued under arrest until the 29th of September following, when he was discharged by a Supreme Court commissioner, on the ground that a discharge in bankruptcy, granted on the 17th of September, relieved him from the fine, costs, and expenses, which he had been ordered to pay. In the Court for the Correction of Errors, it was contended, on behalf of Spalding, that the proceedings under which the fine had been imposed, being under the Eevised Statutes, providing for the enforcement of civil remedies, should, though in form criminal, be regarded simply as another remedy for collecting the debt claimed in the chancery suit, and upon which they had been founded; that the fine was, in fact, imposed for the purpose of being applied to the extinguishment of the debt, whenever, in the progress of the suit, it should have been established, but that it was incidental to the debt, and dependent upon it; and that a discharge of the one, must necessarily discharge the other. (7 Hill, 302, 303.) It was in answer to this argument, that the remarks of Chief Justice Helson, above quoted, were made. The question was not presented, nor was any suggestion made by the court, in relation to the point, whether in any case imprisonment might properly be ordered as a punishment, in addition to the imposition of a fine ; nor whether a fine could be imposed merely as a punishment, in a case in which one was imposed to indemnify against actual loss. Section 22 is express, that a fine may be imposed not exceeding $250, over and above the costs and expenses of the proceedings,' even in those cases where no actual loss was *525 occasioned by the disobedience. Such a fine, if imposed, must necessarily be imposed, merely as a punishment, and not as an indemnity; and, when paid, goes to the benefit of the public, and not to the complaining party. Macey vs. Jordan, 2 Hill, 570, was an appeal to the court of last resort, from an adjudication of the Chancellor, that Macey had wilfully violated an injunction issued on a creditor’s bill filed against him, and fining him to the amount of the respondent’s debt, and the costs of the proceedings. The injunction was served on the 23d of Hovember, 1838. On the 5th of December following, Macey violated it, by making an assignment of his property. On the 6th of August, 1842, he was discharged under the Bankrupt Act. In October, 1843, an attachment was applied for, over a year after obtaining his discharge in bankruptcy, to arrest him for the violation of the injunction. In March, 1844, he was adjudged guilty of the contempt alleged to have been committed in December, 1838, some five years prior to the issuing of the attachment. Justice Jewett, in the opinion delivered by him, remarks, that “ the cause for which the fine was imposed, was the criminal contempt which the appellant was adjudged to have committed in violating the injunction.” , (2 R. S. 278, § 10.) The punishment for such an offence, is by fine or imprisonment, or both, according to the aggravation of the case; and where a party has suffered by the misconduct which constitutes the offence, the fine is to be paid to such party. (2 R. S. 528, § 20 to 22.) It may be true, that if the debt had been paid subsequently to the violation of the injunction, no punishment, or only a nominal one, could have been imposed.”......
“ The proceeding, after the attachment issued, was for a criminal offence; and although the respondent might incidentally derive a benefit from the conviction, still the proceeding was not upon the original demand, or for the recovery of the debt.” The judgment of the Chancellor was affirmed, by a vote of twenty-two to two.
The views expressed of these proceedings in the cases referred to, do not at all conflict, nor do they intimate any interpretation of the statute at variance with the ordinary and natural meaning of its terms; if each opinion cited is read, as all opinions should be, with reference to the particular facts of the *526 case in which it was pronounced. They seem to show a uniform understanding of the statute, that the disobedience of an order may not have been wilful; that it may have arisen from an honest misapprehension by the offending party of the nature of the act which he did ; and may have occurred in good faith, and in the belief that it was not disobedience—that in such a case, if actual loss results from the disobedience, the court has no discretion which will absolve it from imposing a fine which will indemnify the injured party for the loss. That in such a case, no fine should be imposed or imprisonment ordered, purely and solely as a punishment, beyond the punishment that may result from the imposition of a fine sufficient to indemnify against the actual loss, and to satisfy the expenses of the proceedings. That the disobedience may also have been wilful and designedly contemptuous; and in such case, the contempt is criminal, and may be punished according to the aggravation of the case. The opinion is intimated by some ' judges that, in case the contempt is criminal, and actual loss ensues, the fine imposed should be regulated in its amount with that of the actual loss, and is to be paid to the party injured. But no opinion is intimated, that no imprisonment can be superadded in such a case, solely for the purpose of punishment.
It seems to be clear, also, that in case of wilful disobedience, although no actual loss is suffered, a fine not exceeding $250 may be imposed, under section twenty-two, solely as a punishment of the criminal offence ; and that imprisonment may be ordered, under section twenty-five, for a reasonable period— “ as the nature of the case shall require.” (Section 20, ib.) If imprisonment cannot be ordered under section twenty-five, solely with that view, then that part of the section which prescribes the limit of six months, is nugatory; for the reason, that imprisonment ordered to coerce the payment of the fine, must continue until it is paid; while this section expressly provides, that the imprisonment shall be “ until the costs and expenses of the proceedings are paid; and also, if a fine shall be imposed, until such fine be paidand this is in addition to an imprisonment ordered for some reasonable time not exceeding six months; which, of course, must terminate when the *527 period expires—although the fine has not been, paid, and cannot terminate before, even if it has been paid—while the imprisonment may continue for years afterwards, and until the fine is paid; but is continued simply because it is not paid. I admit an inability to conjecture what case may arise, in which it would be proper, in addition to imposing a fine that would indemnify the injured party, and satisfy his costs and expenses, to order an imprisonment as a punishment exceeding in duration that which the court could order, if the proceeding was one simply to punish the offender for a criminal contempt. The revisors, however, suggested that such cases might arise,- and submitted sections, framed with á view to confer such power; and the Legislature enacted the sections as proposed, and under this Exposition of the views with which they were framed.
What effect the passage of the resolutions referred to in the interrogatories should justly have upon the final judgment of the court, is a question not now under consideration; and is one in respect to which the parties should be heard, and which should be carefully considered, with all other attending circumstances, before any opinion is formed. But it must be obvious, that the passage of those resolutions unexplained is pertinent to the question whether the disobedience was wilful, or was an act done in good faith, and in the honest belief that nothing prohibited by the injunction was done by the defendant in voting for the resolutions referred to in the fourth interrogatory. If they tend to show, that the acts which are alleged to constitute a violation of the injunction were done in good faith, and in the honest belief that they did not violate it, then, according to all cases, and upon principle, there should be neither fine nor imprisonment, for the purpose of punishment, if no actual loss has resulted to the relators. There should be neither fine nor imprisonment, for the very reason that the act of disobedience was not wilful, but was done in good faith and without any intention to disobey. If this be so, then it would seem to be equally incontrovertible, that if, unexplained, they tend to show that the disobedience was deliberate and designed, and that the acts done were understood as being expressly prohibited by it, such a consideration cannot be overlooked, in *528 any final adjudication, based on correct principles and justly adapted to the nature of the case. I should not have deemed it necessary to have examined or discussed this question so fully, were it not of the highest importance, that in every case that may arise, these proceedings should be conducted throughout on principles applicable equally to the case of all parties offending, and with a correct understanding of the meaning and object of the statute under which they are prosecuted; and that I felt it incumbent, from the confidence with which eminent counsel avowed the views they presented, to distrust the accuracy of my own previous convictions, and to consider, upon a full examination, whether they were well founded. On such examination, I cannot resist the conclusion that the interrogatories excepted to are pertinent and proper; and that it is the duty of the defendants to answer them.
The' court then decided that the interrogatories excepted to must be immediately answered.
Alderman Sturtevant then filed the following answer, with which those of the other aldermen (which were also filed) corresponded in substance.
To the fifth interrogatory he saith, that he did at such meeting, and immediately after the adoption of the said resolution, move the adoption of the preamble and .resolutions, of which a copy marked C. is annexed to the complaint.
That in making that motion, his only motive was to vindicate the dignity and assert the rights of the Common Council of the city of Hew York, and of their whole constituency; which dignity and rights he believed to be unjustly and illegally assailed by the injunction and complaint on which it was founded, of a portion of the contents of which he had heard through public rumor. That the motives of the members of the Common Council were aspersed, and then self-respect wounded by the charges of the said complaint; and that the circumstances under which the injunction was obtained and served, were highly irritating.
Thte resolution had been pending nearly two months; the * chambers of the judges were within a few rods of the chambers of the Common Council and the mayor’s and other public offices of the city, and in the same building with the office of *529 the Corporation counsel. There had been ample opportunity to apply for the injunction before, and even at the time when it was applied for, there was time enough for notice to the Corporation, and hearing them, before granting the injunction; that the Common Council was to expire on the 3d January,. 1853 ; and when the respondent heard that an injunction had been granted without notice, and continued beyond the time when the Common Council was to expire, and requiring the ' defendants, as if in mockery, to show cause against it, on the 12th of January, he believed that it was a device of the opponents of the road to defeat the resolution by indirection, and virtually, get the case decided without a trial.
This respondent also believed, as he still believes, that the court had no jurisdiction to grant the injunction; and knowing that it is the right of every citizen to question and defy the exercise of illegal power, he did, under the influence of all these considerations, move and vote for the said resolutions; but, in doing so, he did by no means intend any disrespect to Judge Campbell or to question the exercise of any rightful power, or offer any resistance to the law, or any contempt to the lawful authority of the court.
In answer to the sixth interrogatory he said, that the said preamble and resolutions were adopted by the board of aider-men.
These answers being read, the questions as to the nature and extent of the punishment that ought to be imposed, were argued in extenso by the counsel of the parties.
March 12th.—The defendants being present, the court proceeded to judgment; and the judges delivered the following opin' ons:—
By the Court. Duer, J.
We are now to determine whether the members of the Common Council, who have been s&verally brought before us by a process of attachment, have been guilty of the misconduct that is alleged against them, and if so, whether this misconduct has operated, or was calculated “ to defeat, impair, impede, or prejudice the rights or remedies ” of the relators in the prosecution of their original and pending suit (2 R. *530 S. sec. 20, p. 538). These are not the only questions that we have found it necessary to consider and decide; but they are the first in the order of the judgment now to be pronounced.
The misconduct that is alleged against all the defendants in »the affidavits upon which the motions for the attachments were founded, and in the interrogatories that have since been filed, is that of a contempt of the authority of this court, by an act of positive disobedience to its lawful order ; and the aldermen who are before us, with the exception of Alderman Doherty, are also charged with having given their assent, by their votes, to the passage of certain resolutions, not only denouncing the order, which they were required to obey, as an unprecedented act of usurped authority, but containing scandalous imputations upon the conduct and motives of the judge by whom the order was issued. These resolutions are set forth at large in the proceedings, and it has been insisted that they are evidence, not merely in support of the principal charge, but of a distinct and substantive offence, which may and ought to be treated as' a wilful and criminal contempt.
It is manifest, that we cannot do otherwise than adjudge each of the defendants to have been guilty of the alleged contempt, by his personal refusal to obey the order of injunction which has been so publicly violated, if we adhere to the opinion, that the order was rightfully issued, and properly served, and individually binding; and upon these questions it is only necessary now to say, that the convictions which we fully entertained, and have endeavored fully to express, are wholly unchanged—they have not been weakened, but confirmed, by subsequent reflection and research. We have held, and now hold, that the order of injunction commanded each individual member of the Common Council to-refrain from aiding or assisting in the performance of the corporate act which the order prohibited; and, consequently, that it was violated by every member who voted for the resolution in favor of Jacob Sharp and his associates, with the intent that the grant, which the resolution contained, should become, by its immediate acceptance, operative and effectual. Each of the defend-. ants, in his answer to the fourth interrogatory, has admitted that he voted for this resolution—nor has one of them attempted to *531 deny that he so voted, with the intent that the resolution should take effect as an immediate and positive grant, and in the confident expectation, that hy the acceptance of the grantees, it would become so. The meaning and motives of the entire transaction are indeed too apparent to admit of doubt or denial. It is evident from the papers before us, that the written acceptance of the grantees must have been prepared and signed before the resolution was finally adopted, since, as soon as the anticipated final vote was taken, it was delivered and filed.
Nor is any argument requisite to show that the misconduct of the defendants, in violating the injunction, has tended to impede and prejudice the rights and remedies of the relators in the prosecution of their suit. Such was not merely its tendency and design, but such has been its actual effect. If the grant forbidden by the injunction had not been made, all the relief that the relators seek might be obtained in the present suit. The grant to Jacob Sharp and his associates has altered, in some degree, the nature of the relief to which the relators may be entitled. A decree, not merely prohibiting, but vacating the grant, must now be sought; and hence the grantees are necessary parties in the further prosecution of the suit. They are now the real parties in interest, and consequently, a final decree affecting their rights as such, cannot be made, until they shall have been brought in as defendants, by a supplemental complaint. The necessity of a proceeding which impedes, and, by the expense and delay which it creates, prejudices, the remedy of the relators, as plaintiffs in the suit, has arisen solely from the misconduct of the defendants now before us.
Reserving for separate consideration the resolutions passed by the Board of Aldermen, it follows from the observations that have now-been made, that each of the defendants, by violating the order of injunction, has been guilty of the misconduct alleged against him, and which, as a contempt of the court, I am required to punish. Such accordingly, in relation to each of them, is the judgment that I now pronounce.
The statute applicable to the case makes it the duty of the court, when the alleged misconduct of a defendant, prosecuted for contempt, and its effects or tendency, have been proved to its satisfaction, to impose upon him the penalty of a fine or *532 imprisonment, or both, in its discretion, and as the nature of the case may require. (2 R. S. p. 538, sec. 20.) When the guilt is proved, a penalty must follow; but the discretion of the court, in fixing the penalty, must be exercised within certain limits, both in respect to the amount of the fine, and the duration of the imprisonment that may be imposed ; and that discretion, it must also be observed, is not arbitrary, but judicial; and its exercise must therefore be governed by those considerations by which alone the mind-of a judge may reasonably and justly be influenced. Such is the meaning of the statute in directing that the penalty must be such as the “ nature of the case may require.”
What, then, is the penalty that the nature of this case, it may justly be said, requires us to impose ? What the measure of punishment with which the misconduct of the defendants, in their public disobedience to a positive and most intelligible order of the court, ought to be visited? Banishing from our minds all extraneous and personal considerations, and fixing our attention alone upon those which arise upon the evidence, and which mark the character, and throw light upon the motives, of the transaction, what is the answer that these questions ought to receive ? The answer, that we deem to be appropriate and necessary, and the conclusions at which we have arrived, I shall proceed to state, as the judgment of my associates, as well as my own; and it is.due to the public and to the defendants that the reasons by which we have been governed, in forming our judgment, shall be fully explained. This is one of the occasions on which the interests of truth and justice require, that the judgment of the court shall not merely be declared, but vindicated.
Had it been proved, that the relators had sustained an actual loss, from the misconduct of the defendants, we should have had no discretion as to the amount of the fine to be imposed. They would then have been entitled to a full indemnity, over and above their costs and expenses ; and, consequently, a fine, which, equally divided among the defendants, would have secured that indemnity, must have been imposed. (2 R. S. p. 536, sec. 21.) But we think, that no evidence has been given of an actual loss, for which a definite sum, as a compensation, may *533 be awarded; and it is only to such losses—losses pecuniary in their nature, and the amount of which may be estimated with certainty—that the provisions of the statute can, in our opinion, be held to apply. The relators, therefore, are entitled only to their costs and expenses.
In cases in which the defendant is adjudged to have been guilty of the alleged contempt, but no loss, beyond his costs and expenses, to which in all cases he is. entitled, is shown to have resulted to the prosecuting party, the court may impose a fine not exceeding $250, and imprison the defendant for a period not exceeding six months, or, in the exercise of its discretion, may inflict either penalty in its full, or a limited, extent (2 R. S. p. 537, secs. 22, 23, 25). But we are clear in the opinion Fiat in those cases no penalty whatever, beyond the costs and expenses of the prosecution, ought to be imposed, unless it appears that the misconduct, as proved, was, in its nature, a criminal contempt, which, as such, the court, for the sake of a public example, and the necessary maintenance of its own rights and authority, is bound to punish; and such, we apprehend, is the settled construction of the statute.
Hence", in all these cases, the first necessary inquiry is, whether the alleged contempt was wilful and intentional, or accidental and undesigned ? the result of pardonable ignorance, error, or inadvertence ? or a deliberate act of conscious disobedience ? And when the disobedience is shown to have been intentional, and the question of a fitting penalty is alone to be determined, all the circumstances, by which the offence was palliated or aggravated, must be considered, in determining the measure of its punishment; and, in the discharge of this duty, the answers of the defendants to the interrogatories demand special attention; whether the language is that of regret and apology, or of contumacy and defiance, is a material inquiry.
These- views have been present to our minds in examining the cases now before us, and we lament to say that we have been unable to resist the conviction that :the disobedience of the defendants, each and all of them, to the order of injunction, was not the result of accident or inadvertence, but was intentional, deliberate, and wilful. I mean “ wilful ” in the sense of *534 a determination to do what is known to be forbidden. In the plainest terms the order forbade them to grant a certain privilege to Jacob Sharp and his associates—and with a full knowledge of the order, its import and object, this very grant they made. The resolution which they adopted was this grant; and hence, they could not for a moment have doubted that an order forbidding them to make the grant, forbade them to pass the resolution. Whether they acted in the belief that their disobedience to the order could be justified, is a different question; but such a defence is itself an admission that they fully understood the mandate, which they were resolved to violate. We desire to put as favorable a construction upon the conduct of the defendants as it can possibly bear; but to our minds, there is no escape from the conclusion that they have, intentionally and knowingly, done the act which the order of this court commanded them not to do.
Hor let it be said, that in stating this as our undoubting conviction, we disregard and reject, as unworthy of credit, the declaration made by each of the defendants, in his answer to the fourth interrogatory, namely: that “ he believed that the injunction did not purport, nor mean to restrain them from voting, in favor of the resolution” making the grant which was prohibited; for although we are forced to regard this declaration as ambiguous and evasive, it is not necessary to reject it as wholly untrue. It admits of an interpretation which may reconcile it with the conviction we have expressed, while, if understood in the obvious sense, which the words seem intended to suggest, it cannot be reconciled with the public acts and declarations of the Board of Aldermen, at the very time, to which this declaration, in their answers, refers. And were we reduced to the painful necessity of an election, it is to contemporaneous declarations, made for the very purpose of explaining and vindicating this act of disobedience to the process of the court, that our confidence and credit would in preference be given. The resolutions introduced by Alderman Sturtevant, and voted for by all the aldermen, .with one exception, who are now before us, are conclusive evidence that the order of injunction was then understood by them in the'very sense that we have given to it, and that, thus understanding, they meant to violate it. *535 These resolutions denounced the order of injunction as an illegal restraint upon the legislative action of the Common Council, and, upon that ground, proclaimed a determination utterly to disregard it. But if the injunction was then understood by them as neither prohibiting in terms, nor meaning to restrain the members of the Common Council, from voting for the resolution in favor of J. Sharp and his associates, with the-intention that the resolution,' when adopted, should operate as a grant, it imposed no restraint whatever upon their legislative action, nor by their voting as they did, was it at all disregarded. Indeed, upon this construction, the Common Council, as such, could not disregard it. It is painful, but necessary, to state the alternative. Either the injunction; when served, was understood by Alderman Sttirtevant, and those who acted with him, as restraining them from voting in favor of the resolution making the grant it prohibited, or it was not. If it was, then the declaration they have now made, in its obvious sense, asserts the existence of a belief which they never entertained. If it was" not, then his resolutions vindicating the rights and dignity of the Common Council were based upon an assertion which he and those who voted with him then believed to be false, and were, consequently, a most gratuitous as well as intemperate attack upon the conduct and motives of the judge by whom the injunction was issued. And, upon this supposition, the passage of the resolutions was a malicious and wanton insult— a contempt as criminal and aggravated, in its nature, as a court of justice has ever been bound to notice, or compelled to punish. But this supposition we do not hesitate to reject, for although the resolutions of Alderman Sturtevant may convey imputations, and be expressed in terms, that render them justly liable to animadversion and censure, yet we do not at all doubt that the injunction was regarded, not only by those who voted for those resolutions, but by every member of the Common Council, as restraining their legislative action, by enjoining them not to adopt by their votes the grant, which it described and prohibited. It is manifest, however, that if Alderman Sturtevant, and the Aldermen who voted with him, acted in this belief, the credit of their veracity can only be saved, by construing their present declaration, not in its obvious, but in a *536 very qualified sense; and it is this qualified and charitable interpretation, therefore, that we adopt. The order of injunction commanded the Corporation and its members to desist and refrain from making a certain grant, but did not command the members of the Common Council not to vote in favor of the resolution they were about to re-consider, unless the intended and necessary effect of its adoption was to make the grant that Was forbidden. Such, however, was not its necessary effect; since, when they voted for the resolution, they might at the same time have suspended its effect, as a grant, until the injunction was dissolved, or, until the happening of that event, have forbidden the acceptance of the resolution by the grantees, or the filing of that acceptance by their own clerk; and had either of these courses been followed, there would have been no intentional breach of the injunction—no conflict between the Common Council and the judiciary would have ensued, the city would have been saved from the disgrace of the unseemly spectacle that we now witness, and the judges of this cqurt have been relieved from the discharge of a most painful duty.
Why a course of proceeding, by which all these consequences would have been avoided, was not in fact adopted, it is unnecessary and would be irrelevant, now to inquire. We are, however, told by the Assistant Aldermen that they not only believed, but were advised by counsel, that the injunction did not purport nor mean to restrain them from voting for the resolution which they reconsidered and adopted; but we are bound to presume that this advice was given, and was understood to be given in the belief that one or other of the courses, that we have indicated, would be followed—in other words, that although the resolution might be passed, its effect, as a grant, would be suspended, since we find it impossible to believe that any counsel could have advised them that if they adopted the resolution, so as to render it effectual, as a grant, the injunction would not be violated-. Ho counsel could have advised them that the injunction would not be broken, if they made the grant,'which in plain words it commanded and enjoined them to desist from making. While upon this subject, we deem it necessary to observe, that the advice of counsel,.when stated in general terms, as it here is, will never be accepted by this *537 court, as excusing or palliating a contempt, which is otherwise manifest or proved. The advice, when thus stated, will never be permitted to affect our decision. To enable us to regard it, at all, the names of the counsel must be given, and the information that was laid before them, and the exact import of their advice, be fully stated. If the advice was written, the writing must be produced—if oral, the fact that it was given, ' and its precise import, must be verified by the affidavits of the counsel who gave it. The propriety of these rules, and the necessity of adhering to them, will be doubted by none who have any knowledge of the difficulties that beset a court in the due administration of its justice, and of the means too frequently employed, by a suppression of truth, to evade its authority. The result of our observations upon that part of this case, which we have now considered, is, that we cannot regard the declarations of the defendants, in their answers to the fourth interrogatory, that they “ believed that the injunction did not purport nor mean to restrain them from voting ” as they did, as meaning, that they were led to disobey the positive order of the court, by their ignorance and mistake as to its true import, but simply that the injunction did not prohibit the naked act of voting for the resolution in favor of J. Sharp and his associates, if, by so voting, no effect was given to the resolution as a grant. It is true, that the declaration, thus construed, is irrelevant and evasive; but it is better that we should censure it as evasive, than be forced to reject it as untrue. We cannot believe that there is any one of the defendants who have been attached; were the direct question now put to him, whether he believed that the object of the injunction was to prevent them from adopting, as a grant, the resolution they were met to reconsider, who would give any other than an affirmative reply. It is indeed manifest, that unless such Avas its meaning and obj ect, it had none whatever. It was inoperative and senseless.
Passing then from that, Avhich we deem a necessary conclusion, that the defendants knew what the 'injunction meant, and meant themselves to disobey it, we are next to consider, whether any reasons have been alleged that should induce the court to *538 mitigate, or, so far as our discretion may allow, remit, the penalty, that, otherwise, it would be our duty to impose.
The only reason that has been alleged, that we deem it at all necessary to notice, is, that the defendants fully and sincerely believed that this court had no jurisdiction to issue the injunction, and, consequently, that they were under no obligation to obey it. That, as a court of equity, we possess the jurisdiction, we have already decided; but it has been contended that, conceding our jurisdiction, the opposite belief of the defendants should induce us, so far as we can, to exempt thejn from the punishment their disobedience might otherwise have merited, since, if intentional', it was conscientious, and the result of a pardonable error: The answers of the Assistant Aldermen contain no averment of their past belief in our want of jurisdiction ; but, as they now deny it, we presume that the omission was accidental, and shall give them all the benefit to which the excuse, had it been made, would entitle them.
Our first observation here is, that the averment of the defendants’ belief in our want of jurisdiction, is plainly immaterial, unless the meaning is, that this belief was the motive of their conduct. It is manifest that a belief, which had no influence upon their action, can never be permitted to define its character. The fact that we have no jurisdiction would be a complete defence, but the erroneous belief can be no excuse for an act of disobedience with which it was wholly unconnected. To set up the excuse, therefore, is to admit that the disobedience was intentional.
We next observe, that it is not alleged that this belief of the defendants, however sincere and conscientious it may have been, was founded, at all, upon the advice of counsel; still less is it pretended that, upon this ground, they were advised by counsel to “disregard utterly” the order of injunction. For aught that appears, or we are at liberty to intend, it was the advice of Alderman Sturtevant alone that was given and followed. Had the fact been otherwise, it was so material, we must believe, it would have been stated.
Under these circumstances, we are constrained to say, that the alleged belief of the defendants, that the injunction which *539 they were required to obey was illegal and void, furnishes a very slight, if any, excuse for the course which they followed. Upon so grave an occasion, to. act upon their own belief, to use the mildest words, was the extreme of indiscretion and rashness. The public disobedience of the Common Council of this city to the positive mandate of a court of general jurisdiction, hitherto possessing, we trust, the entire confidence of the public, was an act of no trivial importance. The history of our country, we believe, affords no instance of a similar resistance to judicial authority. Viewed in its possible consequences, it was calculated, as an example of disrespect and insubordination, to affect-widely the peace and good order of society, and, from the conflict which it threatened, even to impair the confidence of all reflecting men in the stability of -our institutions. To venture upon such an act was to assume a deep responsibility—a responsibility that should never have been assumed, unless upon the fullest deliberation, the best advice, and the pressure of a stringent and imperious necessity ; yet this responsibility was assumed, and the act performed, without deliberation, without advice, and without necessity. The supposition that there was any necessity for immediate action, is plainly groundless. We have already shown that the resolution, which the defendants, notwithstanding the objections of the Mayor, were determined to adopt, might have been adopted, had its operation as a grant been suspended, without violating the injunction; but, were it ' otherwise, what reason had they to doubt that a measure, which they believed to be recommended and justified by the strongest reasons of public utility, would be rejected by their successors? And if they were confident in their opinion that the injunction, which they were required to obey, was issued without authority, what reason had they to doubt that, upon application to the court, it would be promptly dissolved ?
In the opinion that I gave, in granting the motion for an attachment, I said, that “if the order of injunction Avas issued without rightful authority, the members of the Common Council, in the just maintenance of their own rights, were bound to disregard it,” and this language has been quoted upon the present argument; but I added—language that was not quoted —that “ if this court, upon any ground, possessed the jurisdic *540 tion that was denied, it was at their own peril that the members of the Common Council refused to submit to its exercise.” It is this language that I now repeat. He who resists the order or process of a court of justice, trusting to his own belief of its want of jurisdiction, acts, in all cases, at his own peril, and when he is proved to be mistaken, is, in all cases, justly punished. And I add, that it is upon this principle alone, that the supremacy of the law, and the just authority of courts of justice, can be maintained.
An unconstitutional law has no force, it creates no duty of obedience; but he who resists a law, because he thinks it unconstitutional, may be involved, by his mistake, in the guilt, and incur the penalty, of treason. Resistance to a law, and disobedience to the process of a court, stand upon the same ground, and every citizen is bound to know that his private conviction, if erroneous, that the law or the process is void, will never be admitted as a justification, and very rarely as an excuse. His only safe course is to obey, knowing that if wronged by his obedience, the law will afford him a full redress.
I have no right, and do not mean to draw in question the sincerity of the belief that the defendants have avowed, and under which they claim to have acted, yet it is not a little singular that this belief was entertained, since there are several cases in which the jurisdiction that is now denied has been exercised, and its exercise, although questioned, submitted to by the Common Council. I refer, without dwelling'upon them, to the case of Lawrence v. The Mayor and Corporation, 2 Barb. 577; to that of Brower v. The Corporation, 3 Barb. p. 254; and to a more recent case, which, I believe, has not yet been reported, that of Christopher and Tilton v. The Corporation and others, —the well known Washington Market case. In each of these cases, the objection to the jurisdiction of the court, upon the ground that the inj unction prayed for was an illegal interference with the legislative action of the Common Council, was distinctly raised; in each, it was decisively overruled, and in each, the judgment, as I understand, was acquiesced in by the Corporation. ' In the last case, Judge Roosevelt maintained the jurisdiction of the Supreme Court, as a court of equity, upon the *541 "broad principle that, “ corporate property and corporate credit are a trust fund, and corporate powers of taxation trust powers; and a threatened misapplication of the one, or misuse of the other, is a breach of trust, which a court of equity has the power, and in cases of sufficient magnitude and aggravation is bound, to restrain.” Such are the words of that learned judge, and most strikingly are they applicable to the actual case which the relators have set’ forth in their complaint. It is true that the effect of the injunction, in the cases I have cited, was to restrain, not the passage but the execution of an ordinance; but this distinction does not at all affect the question of jurisdiction. To restrain the execution of an ordinance, is to declare its nullity ; and a decree annulling an ordinance is just as plainly an interference with the legislative discretion of the Common Council, as an injunction prohibiting its adoption. The power of a court of equity to annul, and its power to restrain, I apprehend, are co-extensive; and hence it will be found, that in every case in which the court has refused to interfere, by an injunction, with the exercise of a discretionary power, the refusal has proceeded upon the ground that the act sought to be restrained would be valid, if performed. In each of "these cases, had it been admitted or proved to the satisfaction of the court, that the contemplated act would be an excess of authority, a breach of trust, or a fraud, the injunction would have issued. A court of justice, it must be admitted, cannot restrain the passage of an act of the Legislature, which, when passed, it may declare, as unconstitutional, to be void ; but the Common Council is not a legislature, created by the constitution as a coordinate branch of the government, and as such, in the discharge of all its duties, wholly exempt from judicial control; and the supposition that such is its character, and such its privileges, is a grievous and dangerous error. For are the cases that have been referred to all that have occurred. A case, still more remarkable in its circumstances, has occurred, during the past year, in-this court, which, it seems indeed strange, should not have been remembered. I refer to the case of Pettigrew and Sherman v. The Corporation and others,—a suit which arose out of the controversy in relation to the Eighth Avenue Railroad. The injunction, in this case, was granted by Chief Justice Oakley, *542 and in its tenor resembled that which the Common Council have now refused to obey. It commanded the Corporation to desist and refrain from making and executing any contract or grant, securing to any other persons than the plaintiffs, the right or privilege of constructing the railroad in question. It was construed by the Common Council, as restraining their legislative action upon an ordinance, which the Mayor had returned with his objections to its passage,-and upon the ground that such was its construction and force, so far from disputing its validity, and denouncing it as an invasion of their rights and privileges, they made a special application to the court by their counsel, to be released, by an alteration in the words of the injunction, from the duty of obeying it.
It is true, it was held by the court that the application was needless, and that the injunction did not impose the command which the Assistant Aldermen- feared to violate, but the ground of our opinion was, that the ordinance, which they wished to reconsider, was not the grant or contract which the injunction forbade to be executed, but contained an express provision, that the permission, which it gave of constructing a railroad, should not take effect until a sufficient agreement between the grantees and the Corporation, to be drawn and prepared by the counsel of the latter, should be signed and executed. The application, however, was still pressed, and would, doubtless, have been granted, had not the counsel for the plaintiffs given a written stipulation that they would not insist upon that construction of the order of the court, which, it was feared, would be adopted and enforced.
It was in August or September last that these proceedings took place.
Remembering these facts, I pass, with much regret at the necessity, which my duty imposes, to the resolutions and preamble which were introduced by Alderman Sturtevant, and adopted by the votes of all the Aldermen, with the exception of Alderman Doherty, who are now before us. These resolutions and preamble, from the terms in which they are expressed, and the imputations which they plainly convey, are regarded by all of us, not merely as an aggravation of the contempt of wilful disobedience to the order of injunction, but as constituí *543 ing, in themselves, a distinct and very serious offence, which we might well have been required to punish as a wilful contempt, even had our own convictions forced us to disclaim our jurisdiction. We cannot give to them the favorable interpretation that we were urged to adopt. We cannot regard them as merely vindicating the rights and dignity of the Common Council, in terms, it is true, not well chosen and somewhat passionate, but implying no disrespect or insult to the judge who granted the injunction, nor conveying the slightest imputation upon his integrity or motives. ,
The preamble commences with saying that the judge had issued the injunction without “ any color of law, or justification,” words, which have not merely been demonstrated to be untrue, but, which, if they do not necessarily imply a charge of positive corruption, certainly do, of the grossest ignorance. The preamble proceeds to say that, as the injunction was issued at the close of a session and threw forward the period of showing canse against its continuance beyond the expiration of the session, and this, in regard to a measure that had long been pending, it bore “ upon its face a character of indirection,” (in other words, trick and dishonesty,) “ not less unjustifiable and not less unworthy of the judiciary” than its usurpation of authority and jurisdiction. As the indirection here charged is declared to be “ unworthy of the judiciary,” it is to the judge who issued the injunction hearing this character, that the dishonesty, which the term implies, is meant to be imputed. We forbear from any further analysis or comments. The plain meaning of the preamble and resolutions is this, that the plaintiffs, knowing that they had no right to maintain their suit, and could not by fair means defeat the measure to which they were opposed, resorted to those, which were indirect and unfair, and that the judge, who, without a color of law, issued the injunction, by continuing it in force beyond the expiration of a session which was about to close, lent himself to their fraudulent design. The publication of resolutions bearing this interpretation, we cannot but regard as a direct and very dangerous interference with the administration and course of justice. It was calculated to.prejudice the public mind in relation to the merits of a pending suit, to destroy all confidence in the integrity of a *544 judge, whose probity had never been impeached; to intimidate his brethren from giving their sanction to his act, and to.degrade in public estimation, the entire tribunal to which he belonged. It remains only to add that neither the author of these resolutions nor any of those, who consented to their passage, with the exception of Alderman Wesley Smith, has chosen, in his answer to the interrogatories, to utter a single word of apology—a solitary'expression of regret. I forbear from further comments, and shall close with a few general observations, which the novelty and the importance of the case seem to require, and certainly, justify.
We are proud, and justly proud, of our democratic institutions, and rejoice that our country—a country, in which the legal distinctions of rank are wholly unknown, and the people alone is sovereign—exhibits a spectacle of peace, security, and order, a wide-spread scene of human happiness, such as no other country or age has been privileged to witness. But we shall greatly err, if we attribute the multiplied blessings we enjoy, our unexampled progress, and unexampled prosperity, solely to the nature and force of our peculiar institutions. The experience of other countries, in past ages, and in the present, might well convince us that the institutions in which we glory, would be prolific sources of confusion, discord, and misery, were the disposition and habits of the American people, resulting from a long course of training and discipline, materially changed; nor is there any hazard in saying, that it is to the peculiar, the distinctive character of the American people, that the admirable and successful working of our peculiar institutions, is mainly and eminently due. There are certain great truths that have been long and deeply impressed upon our minds and consciences, and it is the constant influence and moral efficacy of these truths, as controlling our actions in all the relations of life, public and private, that has formed our national character—the character from which our institutions derive their vitality, and to which they owe their success. These vital, governing truths, are, that liberty and order are inseparable, and that the freedom which is not defined and restrained by law, and consciously, willingly, and wholly, subject to its dominion, is sure to degenerate into licence, proceed *545 to anarchy, and end in despotism. Our country is great, flourishing, and prosperous, because the people has at all times, .in the exercise of its own sovereignty, been accustomed, and ■has rejoiced, to confess the sovereignty of the law, as limiting and controlling its own. It is so, because we long have been, still are, and, I trust, will ever remain, a law-reverencing, law-obeying, and law-abiding people. But it is manifest tnat this deep reverence for the law, this prompt and cheerful submission to its dictates, this fixed resolve to abide its determinations, by which, as a nation, we have, hitherto, been distinguished, are inseparably connected with the confidence which is reposed in those by whom the law is administered, and can, in reality, subsist no longer than while that confidence is felt and maintained. Hence, none are more dangerous enemies to our country and its institutions, by whatever pretext they may seek to veil their conduct, than those who seek to destroy or impair this necessary confidence, by rash denunciation, groundless imputations, open disrespect, .and public disobedience. The inevitable tendency of such proceedings is to weaken and unsettle our government, in its very foundations, and in every branch of its administration. They strike at the root of our national prosperity, and poison and corrupt the fountain from which all our.blessings flow—the supremacy of the law, manifested and sustained by the ready submission of all to its dictates and authority.
The judge then proceeded to pronounce the sentence of the court.
I have no doubt that the sentence that we are about to pronounce will be thought by many far more lenient than the nature of the case, and the observations that I have made would j ustify. But there are many circumstan ces which have induced us to think, that in the existing state of public opinion, it is far better to err upon the side of moderation than upon that of severity. The most aggravated case is that of Alderman Sturtevant; he was the author of these resolutions. His framing and preparing them was a deliberate act. Their adoption by his brethren might have been the result of haste and passion: His case, therefore, must be distinguished from the others. The sentence as to Alderman Sturtevant is, that he shall be impri *546 soned in the city prison for the term of fifteen days; and lie shall pay to the city treasury a fine of $250, and to the relators, for their costs and expenses, $102 07.*
In relation to each of the Aldermen who voted for the resolution of Alderman Sturtevant—with the exception of Aider-man Wesley Smith, who, in suitable terms, has expressed his regret, and has made what we deem a sufficient apology—we impose upon each of them a fine of $250, in addition to the "sum of $101 51 for the costs and expenses of the relators, to he paid to them. Alderman Doherty voted against the resolutions, and Alderman Smith has very properly submitted himself to the judgment of the court by a concession of his error. Upon each of them, therefore, as well as upon each of the assistant aider-men who laid the resolutions upon the table, we. impose a fine of $100, to he paid to the treasury of the city, in addition to the sum of $101 51 for the costs and expenses of the relators. In each of these cases a warrant will be issued, committing the parties to prison, until the fine that has "been imposed,"is paid-
Bosworth, J.
This proceeding has reached that stage, at which it becomes the duty of the court to decide whether the defendant is guilty of the misconduct alleged against him, and if it determines that he is, to also decide what the punishment shall be.
Although this is in fact a proceeding at Special Term, yet having, in connexion with my brother Emmet, sat with the judge before whom the proceeding is pending, not merely to assist him by acting advisorily, hut upon the understanding that the counsel of neither party expects the questions that have been argued here to he re-argued on any appeal that may he taken to the General Term, but that the final determination to he made at the Special Term will he passed upon at the General Term, without further argument; I deem it due to the position in which I am placed, with respect to this proceeding *547 and to the parties who may be affected by the decision, to state the conclusions at which I have arrived, and the reasons on which they are founded.
The complaint, which was duly verified, prayed for an injunction, restraining; and on such complaint an order was made by a judge of this court, “commanding and strictly enjoining the defendants (therein), the Mayor, Aldermen, and Commonalty of the city of New York, their counsellors, attorneys, solicitors, and agents, and all others acting in aid or assistance of them, and each and every of them,” to “ absolutely desist and refrain from granting to, or in any manner authorizing Jacob Sharpe and others” (the persons named in the resolution, a copy of which was annexed to the complaint and marked B), “ or their associates, or any other person or persons, whomsoever, the right, liberty, or privilege, of laying a double or any track for a railway in the street known as Broadway, in said city of New York, from the South Ferry to Fifty-seventh street, or any railway whatsoever, in Broadway; and from breaking or removing the pavement in said street, or in any other manner obstructing said street, preparatory to, or for the purpose of laying or establishing any railway therein, until the further order of this court in the premises.”
The injunction order was granted on the 27th of December, 1852, in an action in this court, in which the relators were pi aintiffs, and recited, that it appeared (to the judge who granted it), from the complaint in that action drdy verified, that the plaintiffs were entitled to the relief demanded in the complaint, and that such relief consisted 'in restraining the defendants as hereinbefore stated.
Before the alleged disobedience of the injunction, a copy of the summons and complaint, and the injunction itself, were duly served on the mayor of the city. The injunction was also served on each member of the Common Council, the defendant being one, by exhibiting to each member personally, the injunction itself, and delivering to and leaving with him a copy of it, and such service was made prior to the alleged disobedience.
On the 29th of December, after such service had been made, the Board of Aldermen, by the votes of a majority of its mem *548 hers (the defendant being one who so voted), passed a resolution, granting to Jacob Sharpe and others the authority and consent of the Common Council to lay a double track for a railway in Broadway, and transmitted the same to the Board of Assistant Aldermen for their concurrence. The latter body passed it on the 30th of December, and on the same day the grantees formally accepted the grant. This resolution had been previously vetoed by the mayor, and was adopted by both Boards of the Common Council, notwithstanding the objections of the mayor, and in disregard of the injunction.
A copy of this resolution, in the form in which it was finally adopted, was annexed to the complaint, which alleged that the members of the Common Council avowed a purpose to pass it, and were continuing their session by adjournments from day to day for the purpose of passing it, and that the persons named as grantees in the resolution avowed a purpose to accept the grant as soon as made, and to immediately proceed, under the authority conferred by it, to tear up the pavement and construct a railway in Broadway. . '
Immediately after the passage of this resolution by the Board of Aldermen, the defendant introduced before that body a certain preamble and resolutions (a copy of which is annexed to the interrogatories filed on this proceeding and marked C), and on his motion, it was adopted by the votes of a majority of that body, including his own. The defendant, in his answer to the interrogatory put to him, states that, at the time of voting for the resolution creating the grant, he did “ believe that the said injunction did not purport, and did not mean to restrain him from voting in favor of the said resolution.”
The preamblé to the resolutions introduced by him immediately thereafter, and adopted on his motion, recites that the judge who made the order had granted it “ without color of law,or justification;” and had assumed the prerogative of directing and controlling the municipal legislation of the city, by prohibiting the defendants therein “ from performing a legislative act;” that said injunction “ bears on its face a character of indirection, not less unjustifiable, and not less unworthy of the judiciary, than the usurpation of authority and jurisdiction which is contained in such an attempted injunction itself;” *549 “ that if such a precedent of unwarranted and unwarrantable interference with the rightful functions, powers, and duties of a legislative body, attempted by a judge, be submitted to or tolerated without a just rebuke,” the consequences subsequently recited might follow; and that the reasons alleged for the injunction are equally “ untenable in law and unfounded in facts:”
The first of the resolutions annexed to the preamble declared that “ it is the duty of the Common Council, on this unprecedented occasion, to protect its own dignity and the rights of the people of the city of Yew York, and its constituency, by utterly disregarding the said injunction on its legislative action, and declaring its sense of the same.”
The second of such resolutions declared “ that the Common Council have an equal authority and right to suspect and impute improper motives to any intended judicial decision of any judge, and consepuently to attempt to arrest his action on the bench, as such judge has in regard to the legislative action of the Common Council.”
ISTo regret is now expressed, either for having disregarded the injunction, or for having introduced or voted for the resolutions in relation to it and the action of the judge who granted it; but it is expressly stated in answer to the fifth interrogatory, that he then believed and still believes “ that the court had no jurisdiction to grant the injunction, and believing that it is the right of every citizen to question and resist.the exercise of illegal power,” he voted for the resolutions under the influence of the various considerations stated in his answer to that interrogatory.
It seems to be too clear to admit of doubt, that he voted for the resolution creating the grant, with' the intent to have the resolution become absolute and effectual as a grant, so far as the Common Council were competent, by any action on their part, to make it absolute and effectual, and with the expectation that the grantees would accept it as provided by the terms of the resolution. They did so accept it.
This act of the defendant was a clear and palpable violation of the injunction. (Ross v. Clussman, 3 Sand. S. C. R. 676.)
It seems impossible to deny, after reading the preamble and *550 resolutions subsequently adopted, that the injunction was understood at the time as prohibiting by its terms, the passage of the resolution creating the grant with the intent to have it accepted and become effectual. That was the very resolution, which the complaint alleged the Common Council avowed a purpose to pass, and the attempt to restrain its passage by injunction was the alleged assumption of power which was denounced, and as to which, they declared it was due to their own dignity, and the people) that they should protect them, “by utterly disregarding the said injunction upon its legislative action.”
There would seem to be no grounds presented on which the court is at liberty to draw the more agreeable and charitable conclusion, that the disobedience was unintentional, or was an act done in good faith, and believed not to come within the letter or spirit of the prohibition.
If it be true, as the defendant avers in his answer to the fourth interrogatory, that, at the time of voting for • the resolution creating the grant, he verily believed the injunction “ did not purport, and did not mean to restrain him from voting in favor of the said resolution;” then the censorious resolutions and pre-' amble introduced by him, and adopted on his motion, have not even the poor apology of momentary indignation, excited by a supposed usurpation of power.
If it be true that he believed it did not purport and did not mean to restrain him from giving the vote which he gave, and with the intent with which it was given, then it could not have been understood by him as interfering with any legislative or other act done by him as a member of the Common Council, with reference to the subject matter of this action.
If that was his sincere belief, then there was nothing to suggest the idea, “ that it was the duty of the Common Council on that unprecedented occasion, to protect its own dignity, and the rights of the people of the city of Hew York, by utterly disregarding the said injunction on its legislative action, and declaring its sense of the same.”
If-such-was his sincere belief, then in his judgment no legislative action contemplated or taken by him had been enjoined. Ho vote which he intended to give, or subsequently gave, had *551 been prohibited. There had been no attempt to control the legislative action of the Common Council, but on the contrary each member Was left entirely free to vote as he pleased, and whenever it might suit his pleasure. But the unmistakable terms of the preamble and resolutions annexed to it, coerce my mind to the unpleasant conviction, that he did understand the injunction to prohibit Mm from voting for the resolution creating the grant, and that the injunction was knowingly and designedly disobeyed.
Such an act is “ wilful disobedience,” is a criminal contempt, punishable as such, and indictable at common law and by statute.
Such an act was calculated to defeat, impair, impede, and prejudice the remedies of the relators. It has actually prejudiced, if not impaired and defeated their rights.
If the facts stated in the complaint are true, if the grant was about to be made under circumstances manifesting a gross abuse of power, and which would make it a fraud upon the rights of every citizen; if the railway, when built and used, would be a public nuisancé productive of special injury to the relatorsj it was their right that the grant should not be made.
If the injunction had not been violated, the whole question might have been determined in that action.
That cannot now be done.. At least it is not clear that it can be. The grantees have acquired rights, if the action of the Common Council has any legal validity; and they are not parties to this action. Bo judgment can be pronounced wMchcan operate directly on them.
If the decisions of the Supreme Court of the United States are a correct exposition of existing law, and as such controlling as authority, then I admit an inability to understand why the resolutions, giving authority to Jacob Sharpe and others, to construct a railway, and their acceptance of it, are not as much a contract as an act of a state legislature, conferring precisely the same powers and rights.
I had supposed it to be well settled that when the Legislature, of a state, whose powers are limited only by the prohibitions contained in the constitution of the state and that of the UMted *552 States, passes an act, being in its nature a contract, and absolute rights have vested under it, that a repeal of the law cannot divest those rights, nor annihilate or impair the title so acquired. That a legislative grant is a contract within the meaning of that provision of the United States constitution, which prohibits a state legislature from passing any law impairing the obligation of contracts; and that the prohibition extends as well to executory as to executed contracts. (1 Kent. Com. 413, 422.)
If the making of this grant was a legislative act, within the proper meaning of those terms, if the Common Council had full power to make it, if this power is beyond judicial control in every conceivable case, no matter how corruptly, fraudulently, or ruinously to the rights of individuals and the public, it may be about to be exercised, it will certainly be an anomaly, if, after the grant has been made and accepted, and the road built in every respect in conformity with the terms of such a grant as is contained in the resolution in question, the Common Council may rescind the grant, and divest the rights acquired under it, precisely as they may. order a street to be widened or extended, or may repeal any mere police ordinance or regulation.
If this be so, then it follows that although a repealing act passed in such a case by ’the state legislature would be nugatory and of no effect, yet such a legislature, has power to authorize another body to exercise legislative powers which it cannot exercise itself, and to give to the legislative action of the body it creates the force and obligation of law ; while the same action, if performed by itself, under the n> -st solemn forms of legislation, would be utterly nugatory and void.
The form of the proceeding by which the Common Council saw fit to confer full and absolute authority on Jacob Sharpe and others, to construct and operate by .themselves and their successors, a railway in Broadway, determined nothing as to the nature of the transaction between that body and Sharpe and his associates. If they chose to grant the authority by a resolution resembling in form a legislative act, then the nature of the transaction is to be determined by the character of its provisions. If they confer power on. certain persons to act *553 under it, in such a manner that they may acquire rights and property solely by force of the resolution itself, and from having conformed to its requirements, the transaction is a contract. Such is the nature of the transaction in question, and the consideration to be paid for the grant is specified in the resolution.
, Instead of being able to have it determined in this suit, whether it would not be a clear abuse of power on the part of the Common Council to make such a contract, and whether the execution of it would not produce a special injury to the plaintiffs beyond that to which every other citizen in common with them would be subjected, and to procure a judgment which would prevent the making of the grant, if the decision should be favorable to them, it now becomes necessary either to amend the proceedings and make the grantees parties, in order to obtain a judgment that can operate directly upon them, or to institute a new action for that purpose.
There can be no doubt then, that the act of disobedience was calculated to defeat, impair, impede, and prejudice the remedies of the relators.
The court were reminded on the argument, of the position taken on the hearing of the order to show cause, that the Code requires a copy of the affidavit on which such an order is made, to be served with it, and were referred to a decision of this court, that to bring a party into contempt for disobedience of an injunction order, it must have been served upon him by ex- " hibiting the order itself, at the time a copy of it is delivered. (Coddington v. Webb, 4 Sand. S. C. 639.)
The rule adopted, in the case cited, if adhered to as a rule to be applied to all cases, would be productive of irreparable injury to parties, as will be manifest from looking into the facts of some of the reported cases, which hold that a party may be punished as for a contempt, when he has knowingly and designedly done acts which he knew, at the time, the court had, by an order, prohibited him from doing, although at the time no order had been served, or in fact entered—but had only been directed to be entered. (Hull v. Thomas Head et al., 3 Edws. Ch. R. 236; The People ex rel. Morrison v. Brower, 4 Paige, 405; Stafford v. Brown md Others, Id. 360; 1 Craig & Phillips, *554 98; McNeil v. Garratt; Com. Digest, Chancery (D. 8); Injunction; Notes a, b, c, d; St. John’s College, Oxford v. Carter and Others, 4 Myl. & C. 498.)
Where a party is directed by an order of court to do something, as to pay money, deposit papers, &c., and his whole obligation to act at all depends not only on the existence of the ' order, but also" upon its being served in a particular manner, it is a proper rule of practice not to hold him guilty of a disobedience of the order for not having done the thing required until he has been shown the order and furnished with a copy of it. There are reported decisions showing that in such cases the Court of Chancery has refused to punish as for a contempt, on the ground that the order itself was not shown to the party at the time of serving the copy.
If my brethren did not consider that the Aldermen and Assistant Aldermen were, as such, actual parties to the suit, and " that there was a complete service on them by the service made on the chief officer of the Corporation, and that such service having been made, it is enough to render the defendants liable to be proceeded against as for a contempt, that they did what the injunction prohibited, with actual knowledge of its existence and contents, I cannot but think they would deem it important to allow the point decided in Coddington v. Webb to be reconsidered, and so restrict its application as to prevent great and manifest injustice from being done under its operation.
If the defendants cannot be considered as being actually parties to the suit in which the order was made, then tire question would arise whether it is operative against them as individuals, and whether they can be proceeded against for having deliberately done, as the agents or officers by whom alone the party defendant could do the prohibited act, what they knew their principal had been forbidden to do, for the purpose of performing it in behalf of such a principal.
It is enough to say, that when an agent, officer, or servant, claims no right to act or interfere at all, except in that capacity, and in that capacity he _does acts which he knows it is unlawful for his principal to do, and which it is impossible in the nature of things for the principal to do except through his action, he has no reason to complain of being subjected to the *555 same consequences as would be visited on the principal himself for disobedience.
The cases cited in the opinion given on the order to show cause—show that such a practice had been pursued.
The 3d sub. of § 1, of 2 R. S. 534, expressly provides not only, “ that parties to suits,” but also, “ attorneys, counsellors, solicitors, and all other persons,” may be punished as for a contempt for the non-payment of'money ordered by the court to be paid, in certain cases, but also “ for any other disobedience to any lawful order, decree, or process of such court.”
There cannot well be a decree against a person not a party to a’suit, which can operate upon him at all, except to prohibit him from doing as the solicitor, attorney, or agent of a party, some act which it enjoins the party from doing.
This section having authorized the punishment of persons other than parties to suits, for any and every disobedience to the lawful order or decree of the court, the language is broad enough to reach, and seems unmeaning, unless it is construed to reach the very case of disobedience of an order, by one person, as agent of another, when he deliberately does what lie knows at the time the court has forbidden his principal and agents to do.
In that way he can disobey an order or decree made in a suit to which he is •• >fc a party. If he chooses to do that, knowing that every person is prohibited from doing it as the agent of the party, and disobeying its acts as such agent, there is no reason why he should not be punished for such disobedience, and for such “unlawful interference with the proceedings in the action.” (Id. sub. 4.)
It is unnecessary to examine further any of the objections taken to the regularity of the proceedings; the nature and character of the disobedience are, at present, the matters of paramount importance.
A somewhat grave and delicate point is presented at the outset to the consideration of the court. It arises out of the adoption of the preamble and resolutions annexed to it, which were adopted by the Board of Aldermen, immediately after the act violating the injunction.
*556 They undoubtedly impute to the judge who made the order the high offence of having assumed, without color of law or justification, to interfere with the legislative action of a body having legislative powers; that his order bore en its face an indirection not less unworthy of the judiciary than the alleged usurpation of authority, and seems to distinctly charge that his acts were such an unwarrantable interference of a judge, as should not be submitted to or tolerated, without a just rebuke-
The publication of such an attack upon the action of- a judicial officer pending a suit, and upon his conduct with reference to any order or decision made by him, in a suit pending and undetermined at the time such publication is made, is a contempt at common law, and punishable as such. The cases cited below, would seem to leave the question free from doubt. (J. B. Wallace’s R. 77, Hollingsworth v. Duane; Oswald's case, 1 Dall. 319; Matthews v. Smith, 3 Hare, 331; Littler v. Thomson, 2 Beavan, 129; 2 Atkyn’s, 469; 13 Ves. 239; 1 Phillips, 454 and 605; 2 Mylne & Craig, 360; Crawford's case, 13 Ad. & Ellis, (N. S.) 613.)
The inevitable effect of such a publication upon all who may give the least credit to its statements, and to the imputations it contains, is to prejudice their minds against the justice of the plaintiffs’ claims, and the truthfulness of the allegations of fact on which they base their right to relief, and to favor the idea that the law 'is not uprightly administered between the parties to the action, and thus to interrupt the free course of justice, and dishonor its administration. Such misconduct tends to prejudice both the rights and remedies of a party. The statute expressly provides that misconduct of that tendency, in all cases where attachments and proceedings as for" contempts, have been usually adopted and practised in courts of record, to enforce the civil remedies of any party to a suit in such court, or "to protect the rights of any such party, may be punished in a proceeding like this. (2 R. S. 534, § 1, sub. 8.)
Besides, it is an “ unlawful interference with the proceedings in an action,” and this, in the same section, is made a distinct ground for punishing a party as for a contempt. (Id. § 1, sub. 4.)
*557 It is not only an unlawful interference with the proceedings in the cause, but it is one whose consequences may be of the most grave and serious character.
In a country whose peace and quiet, and under a form of government whose very existence depends upon a cheerful obedience to law, and upon an absolute acquiescence in such protection to the rights of persons and property, and in such redress by way of the prevention and punishment of wrongs as may result from such obedience, and from an impartial but firm administration of justice between man and man, it is of the highest importance to the public and to suitors, that those who administer the law should not only be pure, but unsuspected.
It is not the personal injury that may possibly result to the members of a court, from falsely speaking, and writing contemptuously of it, or of the judges, in their judicial capacity, who may compose it, of which the wrong done, wholly or in any considerable degree, consists.
But the most grave and serious part of the wrong consists of the injury done to the community at large, by the tendency of such proceedings to dishonor the administration of justice, and impair the confidence of the public in the integrity of those tribunals, to which they turn as a last resort, to obtain that strict and impartial justice to which the laws of the country entitle them.
When our citizens are coerced to feel that such a hope can be no longer confidently cherished, that they cannot be certain of obtaining just redress in the courts of justice, that they must submit to such justice as may be awarded by a court whose official action in the case has been characterized by such 'an assumption and illegal exercise of power, that it ought not to pass. unrebuked, the court's will have become so contemptible that nothing which might be published of them ought to be punished as a criminal contempt.
Yet no pretence has been made that the injunction was not granted from the purest convictions of duty, and on the honest-judgment that the case made by the complaint entitled the plaintiffs to it. The only apology, if it should be so called, that has been made is, that those who disobeyed it had a different opinion of the law from that entertained by the judge *558 who granted it, and that they chose to test the question of the jurisdiction of the court by disobedience, rather than have it determined bj the tribunals created by the people, to settle such controversies in the mode prescribed by law.
No regret is expressed at having passed the preamble and resolutions. On the contrary, the answers to the interrogatories conclude with challenging the authority of the judge to make the order that has been disobeyed, and also the jurisdiction of the court to entertain the proceedings in which it now becomes its duty to make a final decision.
These facts render the duty of the court in pronouncing final judgment still more delicate and embarrassing.
The duty which they are required to perform is one which they owe to the public, as well as to the parties to the proceeding. It is one in which no consideration personal to the members of the court exists or can arise, except such as are attendant upon the decision of every matter submitted to their judgment, and incident to the obligation and the wish to make a decision which will render equal and exact justice to the defendant, the relators, and the public.
This duty, however unpleasant its performance, is not one from which they can escape, or which they can avoid. It is one which they are coerced to discharge by the obligations springing from, the office they hold, the duties of which they have sworn to faithfully and impartially discharge, according to the best of their judgment and ability.
In arriving at the conclusion what order should b,e made, the statute has, as to one part of it, left us no discretion : That is imperative that afine should be imposed at all events, sufficient to satisfy the costs and expenses of the proceedings.
The more serious question remains, whether any fine in addition to this should be imposed, and if so, to what amount, and whether any imprisonment should be ordered, except to coerce'the payment of the fine.
In this case the disobedience was deliberate and intentional, and was immediately followed by the introduction and passage of the preamble and resolutions, to the character and tendency of which sufficient reference has been made. If the defendant had contented himself with merely disobeying the injunction, *559 and such disobedience had resulted from a belief that the judge granting it had no authority to make it, and that the court had no jurisdiction, on any conceivable state of facts, of an action to restrain the doing of that which it prohibited—however pernicious the tendency of the example, the case would have been altogether different from that on which we are now obliged to decide.
The defendant, on his oath, states in answer to the interrogatories, that he not only then believed, but still believes, that the court has no jurisdiction of the action.
That belief may be ultimately held to be in accordance with the law of the land, but the judgment of the court being to the contrary, it can find in it but very little mitigation of the offence, as that is not the mode in which a law-abiding citizen should test in such a case, the accuracy of his opinion. I incline to the opinion that the affidavits read on the part of the defendant on the order to show cause, should be taken into consideration. They contain, it is true, nothing in relation to the fact whether he did or did not disobey the order, and therefore have no bearing upon the question whether he disobeyed it, or whether the disobedience was wilful.
But they contain statements of facts which, uncontroverted, might induce the defendants to believe that the offers, apparently so much more advantageous to the city, were not made in good faith, but were made by enemies of the measure, and under preconcerted arrangements with others equally hostile to it, to take such legal proceedings as would inhibit them from constructing or attempting to construct the road, even if their application had been preferred, and the authority had been given to them.
If such was the state of existing facts, or if he honestly believed such to be the facts, then a case was presented for the exercise of his discretion. And with the mere exercise of his discretion, with reference to such a state of facts, no court, I presume, would interfere.
If such a state of facts shall be shown to have existed, the question of the authority of the Common Council to make such a grant would then be reduced to one of mere naked power, to affect the rights of the public and of individuals, as it might *560 be made to appear that such a road and its use would impair them.
That is a question on which this court has not as jet passed, and does not enter into the considerations upon which it concluded that, on such a case as was made by the complaint, it had jurisdiction to .make the order.
The facts stated in the opposing affidavits do not touch the question of jurisdiction, but bear upon the merits of the controversy, and controvert the truth of some of the facts constituting the equity of the plaintiff’s case.
Heither do they tend to show that the order was improvidently made, if the court is right in its views of its jurisdictional powers, for the judge who made the order was compelled, as he is in the case of every application, to determine upon the propriety of granting it, solely on the facts contained in the affidavits on which the application was based.
These affidavits were not before him, nor could he have justified himself in refusing the order, by assuming, without anything on which to base the assumption, that the facts stated in the complaint, and sworn to be true, were false in any material particular.
Still the court should not overlook the consideration, that on these affidavits third persons swear to facts which, if uncontradicted, presented a case for the exercise by the defendant of a discretion, if it should be ultimately determined, that authority existed to make such a grant, in a case free from a fraudulent úse, or gross abuse of that authority, and provided also that it shall appear that the ro,ad would not be a public nuisance.
The court, it is true, will not try the merits of the action in this proceeding, nor permit a party lawfully enjoined to speculate upon what may be the decision of the court, upon the equity of the complaint upon which the injunction has been allowed, nor to test the improvidence of granting it, by wilful disobedience.
But I think it may properly look into opposing affidavits, so far as to see if there is color for the position; that if the facts existing had all been fully and fairly presented in the affidavits , on which the injunction was sought, the court might have hesitated to grant it, and if that is clearly apparent, to give *561 some weight to it in determining what punishment should he awarded. But there is nothing in the affidavits which essentially mitigates the misconduct of the defendant.
The example set by him is not sought to be excused, but, on "the contrary, to be justified, on the ground, of the utter want of jurisdiction of the court to entertain the action.
Such an example is exceedingly pernicious. So far as it produces any influence, it tends to predispose the community to array their own judgment against that of the tribunals constituted to declare and enforce the law, and to wilfully disobey orders and judgments, whenever the parties against whom they are made, shall come to the conclusion that the court has mistaken the law.
It is obvious that such a practice, if tolerated, would soon result in an open defiance of the administration of justice, through the.constituted tribunals, and the enff would be inevitable and hopeless anarchy.
2STo human judgment is so perfect as to be exempt from a liability to err, nor is the proper interpretation and application of the law in all cases so easy, that different minds, aided by equal industry, experience, and integrity of purpose, will always come to the same conclusion.
State legislatures sometimes, upon full consideration, enact laws which the courts, in the honest and independent exercise of their judgments, believe and adjudge to be repugnant to the constitution and void. Such a law, any person, so far as strict legal right is concerned, may lawfully resist.
But any one who should attempt to question its validity by forcible resistance, rather than by an appeal to the courts, whose province it is to determine that question, and whose powers are sufficient to secure him full indemnity and redress for any injury that may temporarily result from that obedience which becomes the orderly citizen, would inflict a serious wound upon the institutions of the country, violate the principles on which they are founded, and furnish an example which, if generally followed, would lamentably demonstrate that in the community of which he was a member, liberty regulated by law could not long continue.
Courts too, may err, as courts have errgd, in relation to their *562 jurisdiction. When such an error of judgment may unfortunately occur, however much it should be regretted, the consequences are trivial in comparison with those which may result from a wilful disobedience to its orders, and an nnexcused and inexcusable effort to dishonor the administration of justice, by a rude attempt to scandalize the courts of the country, or the judicial action of its members.
The example is still more pernicious in its tendency when set by a man invested with authority, who, by virtue of his office, is a conservator of the public peace, and a member of the courts constituted- to try persons indicted for the commission of crimes. A wilful disobedience of any lawful order of a court was a criminal offence, at common law, and is declared to be such by the statutes of this state, is punishable by imprisonment, in a county jail, not exceeding one year, or by fine not exceeding $250, or by both such fine and imprisonment. (2 R. S. 697, § 40 : id. 693, § 14; id.. 278, § 10, sub. 3 ; id. 538, § 26.)
Giving the defendant the fullest benefit of every extenuating consideration that has been presented, the most favorable judgment that the court can render, consistent with a proper discharge of its duty to the public, is one which does not order imprisonment merely as a punishment, for the full term provided by the statute.
Every one must know that- the members of the court, as a matter of necessity, cannot be ignorant of other and vague charges which are made against members of the Common Council. This fact is alluded to only for the purpose of saying that the judges of this court would be unworthy of the stations they occupy, if they allowed any such extraneous matters to exercise the slightest influence upon their deliberations, or in the formation of their judgment.
The only matter with which they have anything to do is, to determine whether the defendant has disobeyed an order lawfully made by a judge of this court, what is the true nature and character of that disobedience, what effect it has had or is calculated to have upon the rights or remedies of the relators and upon the interests of the community, and to give such judgment as shall be just to them, to the defendant, and to the public.
*563 That judgment should be formed and pronounced under the influence of precisely such considerations as would guide and control it, if the particular misconduct here complained of was the only misconduct ever imputed to the defendant for any act of his life, public or private, ¡¡for this, and this alone, he is now on trial.
In the exercise of my best judgment, I think he should be imprisoned in the county jail for the period of fifteen days, that he should also be fined to the amount of $250, to be paid, when collected, to the Chamberlain of the city, for the benefit of its citizens; and in the further sum of one hundred and two dollars and twenty cents, to satisfy the costs and expenses of these proceedings, to be paid 'to the relators; and ordered to be committed to prison until such fine and costs and expenses are paid.
In giving judgment in such a matter, if there should chance to be any error, the error should be one arising exclusively from the lenity of the sentence, and on no account from its severity.
I think a discrimination should, be made between the case of this defendant and that of any other of the aldermen who merely voted for the preamble and resolutions: they might have so voted without that consideration and understanding of their import, and the manifest impropriety of passing them, which is naturally to be imputed to one who prepared and offered them for adoption.
If the slightest regret for the passage of them had been avowed in their answers to the interrogatories, on which the court could justify itself for overlooking that act, I should be disposed to go as far in that direction as would be consistent with a proper discharge of the duty which the court owes to the public.
But no regret is expressed for that act, or for having violated the injunction: even the legality of the order is still questioned, and the jurisdiction of the court protested against: all but two of them answer in the same form, and thus, present themselves to the court as being alike insensible of the true character and tendency of the misconduct charged against .them, *564 and alike indifferent to the consequences to themselves or the public.
If the sober reflections, and more matured judgment resulting from a subsequent consideration of the matter, have induced either of them to regret the act, or to regard their example as one dangerous in its tendency, 'he has not allowed the court to know it. However much the court may regret this result, it is one over which they have no control: they can look only to the case, as the defendants have preferred to make it, and mast pass upon it, as it is submitted to them for final judgment.
In so deciding upon it, they are not at liberty to overlook the position which the defendants voluntarily choose to take with reference to the act of disobedience, when presenting their case, as they desired it to be regarded by the court in forming its final sentence. (Palmer v. Kelly et al., 4 Sand. Ch. R. 575; Mr. Lechmere Charlton’s case, 2 Mylne & Cr. 359-360.
It is my opinion that a fine should be imposed on each of the other aldermen, except Aldermen Smith and Doherty, of $250, to be paid to the Chamberlain of the pity, and the further sum of $101 51; to satisfy the relators’ costs and expenses of the proceeding.
Alderman Smith has made an apology which, while it does no discredit to him as a man or a public officer, furnishes grounds to the court for making a discrimination in his favor, which it would have been more agreeable to it to have been able to extend to all the defendants, if they had but thought proper to have made such answers to the interrogatories as would have rendered such action practicable.
Alderman Doherty voted against the preamble and resolutions. By this act he repels the idea of intending by his disobedience any other contempt of the lawful authority of the court, than such as arises from a deliberate disregard of the order, induced, perhaps, by the conviction that he was the best judge of what the law was, and that he preferred disobedience, with its consequences to the public and himself, rather than submission to the order, and an application to the court to modify or vacate it.
Each of these defendants should be fined $100, to be paid to *565 the City Chamberlain, and the further sum of $101 51, to be paid to the relators to satisfy their costs and expenses of the proceedings against him.
The case of the Assistant Aldermen is somewhat different from that of the two aldermen last named, or that of either of the others. They took no action upon the preamble and resolutions.
Before voting for the resolutions creating the grant, they obtained, as their answers state, the advice of counsel and were advised that “ the injunction did not purport, and did not mean to restrain them from voting m favor of the said resolution.”
This affidavit is not one which can justify the court in wholly omitting to impose a fine. It is hot one which would prevent the taking' of an inquest, or which would entitle a party to have a default opened, for the purpose of having a trial on the merits.
Hie name of the counsel is not stated, and the court is with-' out any means of conjecturing whether his advice would be entitled to little or much consideration. On what statement of facts the advice was given, the answers do not disclose.
The answers do not state that counsel advised them that, voting for the resolutions containing the grant with the intent of enabling the grantees to accept it, and with the expectation that they would accept it, pending the injunction, would not be a palpable violation of it. We cannot imagine that any respectable counsel would have given any such advice.
That it was voted for with that intent and expectation is not denied. It is too clear in our judgment to admit of a doubt that they did vote for it with that intent and expectation.
In that expectation they were not disappointed. At some hour of the night on which the resolution was fully adopted by their votes, and made absolute and effectual, so far as that result depended on the action of the Common Council, or the will of its members, it was accepted by the grantees in the manner prescribed, and thus the grant became complete.
Ho regret is expressed for violating the injunction, nor is the slightest intimation made that, under similar circumstances, their conduct would be different.
*566 Their answers conclude with challenging the jurisdiction of the court to control, or to call them to an account for their vote.
The court has not attempted to coerce their vote against their convictions of duty, nor made any order which would have prevented them from voting in favor of the resolution.
They were prohibited from granting to Sharp and others the privilege, or in any manner authorizing them to lay a track for a railway in Broadway.
They could have voted for the resolution, if they had added to it a provision that no acceptance of it should be made or filed, or if made, that it should be void and of no effect, if made before the injunction was vacated, or so modified as to allow of such acceptance. If the adopted resolution had been accompanied with such a provision, no court would have entertained a proceeding, to punish them on the ground that they had disobeyed the injunction.
If there had been a disposition to obey the order served upon them, it would seem that obedience might have been rendered, without jeopardizing any right or interest, public or private.
On and after the first of January, 1853, the Common Council would be as competent to pass the resolution against the veto of the new Mayor, as against that of his predecessor.
The same Aldermen continued in office through 1853 ; the changes made in the Board of Assistant Aldermen, by the previous November election, withdrew from it but four or five of its old members.
The adoption of a resolution, for which so many of each board voted, against the objections of the Mayor, and, notwithstanding the injunction, would seem to be certain, if submitted anew to the Common Council of 1853, if the strong favor which it received resulted from a conviction of its paiamonnt importance to the public interests.
_ There was no necessity, legal or moral, coercing any Aider-man or Assistant to vote in favor of it, pending the injunction; the majority by whose votes it was adopted, had the power to postpone the consideration to a future day, or to refuse to consider it then.
The objections and disapproval of the chief magistrate of the *567 city, admonished them that, in his judgment, it ought not to be passed. The order of a court, of competent authority, prohibited them, absolutely, from granting the privilege, or conferring the authority, which 'they did grant and confer by the adoption of the resolution.
It was an order of the court which had on other occasions prohibited them from doing acts which, if performed at all, would be performed by their voting as Aldermen or Assistants in favor of pending resolutions. On other occasions the order had been obeyed.
Under such circumstances, it is the duty of the pourt, after giving the greatest consideration to everything urged in extenuation, not to overlook the act, or encourage others to imitate the example, in consequence of granting to it entire impunity in a case so marked and prominent as this.
In my judgment, a fine of $100 should be imposed on each of the Assistant Aldermen, to be paid to the City Chamberlain; and also of $101 51, to be paid to the relators, to satisfy their costs and-expenses of the proceedings.
In the case of each of the Aldermen and Assistants, ihe order to be entered, should direct that he be committed to prison until he pays the fine imposed upon him, and also the costs and expenses which he is ordered to pay. -
Emmet, J.
Differed with the court as to the amount of punishment; and said:
I regret to say, that while I concur fully with the general views of this case, as presented by the able opinion of Judge Duer, and agree to all the conclusions of law stated by him, I am not so fortunate as to assent entirely to the judgment which he has pronounced. I will endeavor, therefore, briefly to state in what respect I dissent from that judgment, and my reasons for so dissenting. In regard to the amount of fine imposed upon the delinquent parties respectively, both Aldermen and Assistant Aldermen, I have no objection to offer. Nor do I find fault with the judgment of the court as to the particular case of Alderman Sturtevant. ' But if it be right and proper, as I think it is, that Alderman Sturtevant should be punished by imprisonment, as the author and promoter of the resolutions *568 and preamble which contemned the authority and impugned the motives of a judge of this court, I am at a loss to perceive why the other members of the Board of Aldermen who approved of, adopted, and voted for those resolutions and preamble, should be wholly exempted from punishment of the same character.
It is true that the case of Alderman Sturtevant is marked by more prominence than that of either of his associates. Those resolutions and preamble were deliberately prepared by him, and in concocting them, he would seem to have taxed the English language to obtain terms as offensive to the dignity and as defiant towards the authority of this court as a gentleman could well use. He was, moreover, a member of the legal profession, and whatever his opinion may have been of the propriety or legal effect of the injunction, he was bound to know that his duty as a lawyer and a citizen forbade such an attack upon any branch of the judiciary; and that his hand, instead of aiming the blow, should have been raised to stay such an indignity, if offered to this court from any other quarter.
I therefore, not only concur in the propriety of imprisoning him for fifteen days, but if the judgment of the court had been that such imprisonment should be for the full term of thirty days, it would have met with no objection from me. But while I grant the sufficiency of the reasons for punishing Alderman Sturtevant with greater severity than his associates, I cannot admit, that there is just ground for so great a disparity of punishment as the judgment of the court has made between them.
The other Aldermen who voted for those resolutions and preamble, heard them read and deliberately adopted and passed them. It would be a bad compliment to the intelligence of these gentlemen to assume that they did not understand what they were doing. Their official station forbids any such supposition. If they were fit to be Aldermen of this city, they can claim no indulgence on the ground of ignorance of the true meaning and import of those resolutions and preamble, for they could not be misunderstood by any one of common capacity. In substance, they charge a judge of this court not *569 only with assuming prerogatives and usurping authority and jurisdiction without color of law or justification, but that he did so with sinister, unjustifiable, unworthy, and interested views— in other words, with dishonest and corrupt motives; and they deliberately avow the purpose, not merely of utterly disregarding the order of that judge, but of rebuking him for making it. Nor can I discover anything in the answer of these aldermen, to the interrogatory on the subject of these resolutions and preamble, which offers any palliation of their offence; for, although they disclaim the intention to offer any contempt to the lawful authority of this court, they do not disavow the imputation of unworthy motives to the judge, or that he had knowingly lent himself, as a minister of justice, to aid a device of the plaintiffs to defeat the grant by indirection, and virtually to decide the case without a trial. With this view, therefore, of the position of the aldermen in regard to those resolutions and preamble, I repeat that their offence merits punishment in my judgment, by imprisonment, on the same principle as that of Alderman Sturtevant, though in some less degree.
It must not be supposed that I regard the passage of those resolutions and preamble as being capable (however designed) of impairing the standing, or even wounding the personal feelings, of the individual judge against whom they were directed. Certainly, no one of the judges of this court would feel affected by them, in either of those lights. I treat it as an assault upon judicial authority, and would punish it as such.
The judges, as ministers of the law, are but the servants of the public, but they are the depositaries of a trust which it is most important to the best interests of this community to preserve in its integrity and plenitude. I mean the authority of courts of justice—the respect of the people for the law and those by whom it is administered; and, painful as it may be, and as it certainly is to myself on the present occasion, to vindicate that authority and preserve that public respect by severity of punishment, I regard it as a duty in the performance of which the judges of this court are bound not to falter.
I need hardly say that no public rumors as to the official conduct of any members of the late Common Council could possibly influence my course in this matter; and I allude to *570 such rumors merely for the purpose of declaring, as I now do, that were it not for their existence, and the apprehension of its being supposed that a willingness to gratify some public prejudice might have insensibly found its way into my judgment, I should feel much less reluctance than I do, under existing circumstancesj in treating the conduct of the parties now before the court with severity.
I have only to add, therefore, that if the punishment in this case had rested solely with me, I should have felt it my duty to have imprisoned every other alderman, besides Alderman Sturtevant, who voted for those resolutions and preamble, for ten days, except Alderman-Wesley Smith, who alone has, in some degree, apologized for doing so. He has acknowledged the impropriety of the act, and, in a measure, excused himself, by stating that he did so without due consideration at the time. ' - °
For this partial atonement, I should have mitigated his imprisonment to five days.
Alderman Doherty, although he violated the injunction by voting for the grant, "had the decency or discretion to vote against the offensive resolutions and preamble, and for taking that course, I agree in opinion with my brethren, that he should not be imprisoned; and, in all other respects, I concur with the judgment of the court.
Hie. general term, which had been adjourned to this day, was then opened, and held by the same judges.
Each of the defendants, except Alderman W. Smith, who submitted, and paid his fine, then appealed to the general term from the judgment pronounced, and from every previous order made at special term.
The counsel for the relators moved in each case to dismiss the appeal, which motions were denied.
The counsel of the parties declining .any further argument, the judgment and orders appealed from, in each case, were, affirmed, (a)

 The sum. total of the costs and expenses of the relators had been previously ascertained "by a reference, and in the imposition of the fines an equal proportion was charged on each defendant.

 The following is the form of the judgment in the case of Alderman Sturtevant: