Crill agt. City of Rome.

# SUPREME COURT.

## DANIEL CRILL agt. THE CITY OF ROME.

*Mohawk river — the title thereto — use of its waters for different purposes.*

The Mohawk river is a navigable stream, and the title to the bed of the river is in the people of the state. Riparian owners along the stream are not entitled to damages for any diversion or use of the waters of the Mohawk by the state.

Although the law has been settled that the people of the state are proprietors of the waters of the Mohawk river, having the title thereto, the same are not necessarily to be used by them exclusively for purposes of navigation.

The city of Rome was expressly authorized to construct " water-works," and supply the city with water, by an act of the legislature, passed April 24, 1872 (*Laws* 1872, *ch.* 352).

The plaintiff, having a mill privilege in the city of Rome, supplied by water taken by means of a dam and an artificial channel from the Mohawk river, brought an action to restrain the city from taking the waters of the Mohawk river at a point called the Ridge, for the purpose of supplying the city with pure and wholesome water, in pursuance of said act.

*Held*, that if the plaintiff was not the owner of the waters of the Mohawk river, nor entitled, as a matter of right, to their use at the time the defendant began to divert them, then he has no foundation for the action.

The plaintiff claimed title under the " Oriskany patent," April 18, 1705, which he alleged was granted by the English government, and which had full authority to pass the title to a private citizen.

*Held*, that the Oriskany patent was not granted by the English government, but was issued by lord CORNBURY, captain-general and governor of the colony of New York; and assuming that he possessed the same and no greater power than the sovereign of Great Britain, and it not being shown that the sovereignty acted in issuing the patent, it was clear that the patent did not pass the title to the waters of the Mohawk to private citizens named as patentees. The power of the king to grant rights in navigable streams, since *magna charta*, is settled in England against such right. When the revolution took place, the people of each state became themselves sovereign, and in that character held the abso-

lute right to all the navigable waters and the soils under them for their own common use.

The plaintiff claimed a right to divert the waters of the Mohawk for the purpose of his mill privilege, by means of a dam in the river, and that such claim might be sustained by adverse possession and prescription.

*Held*, that the erection of the dam was a nuisance, and the continuance thereof could not, as against the state, give the plaintiff, or his grantors, a valid claim to maintain the interference with the public waters. It is not for the plaintiff to establish a prescription against the state when the state has the right and has exercised the right to the use of said waters.

Plaintiff claimed that when the act of 1872 was passed, authorizing the defendant to take the waters of the Mohawk, the people could not have maintained an action for the use thereof under section 75 of the Code, which declares that the people will not sue for or in respect to any real property, unless within forty years the people shall have received the rents and profits of such real property, or some part thereof.

*Held*, that certainly it could not be maintained that the state, since its purchase of the Inland Lock Company, in 1792, and the construction of the Erie canal of 1817, had not used the waters of the Mohawk river, or "some part thereof." The evidence establishes such use at the city of Rome, and at many other points along the river. Complaint dismissed.

*Oneida Special Term, October,* 1873.

THE plaintiff, having a mill privilege in the city of Rome, supplied by water taken by means of a dam and an artificial channel from the Mohawk river, brings this action to restrain the defendant, the city of Rome, from taking the waters of the Mohawk river at a point called the Ridge, for the purpose of supplying the defendant's "water-works" with pure and wholesome water.

The city was expressly authorized to construct "water-works," and to supply the city with water, by an act of the legislature, passed April 24th, 1872, chapter 352, Laws of 1872.

The mill privilege of the plaintiff is not now in use and has not been for some time prior to the commencement of this action.

*Waterman & Hunt & A. M. Beardsley,* for plaintiff.

*B. J. Beach & Henry A. Foster,* for defendant.

HARDIN, *J.*—Upon the hearing, the defendant offered in evidence Colden's History of the Five Nations of Indians, Stone's History of Brant, The Documentary History of New York, Rees' Cyclopædia, and Jones' Annals and Recollections of Oneida County, for the purpose, in connection with other evidence, of establishing that the Mohawk river was actually navigable for commercial purposes.

The plaintiff objected to the histories, and the maps contained in them, and the question was reserved by consent, and is now determined by overruling the same, except as to Jones' Annals and Recollections. The latter does not purport to be a general history, and its author is living and might be called. The Documentary History was published under the authority of the state, and the writers of the others have long since been dead (1 *Greenleaf Ev.* [10 *ed.*], §§ 491, 492 *and* 497; 7 *Peters*, 554; 1 *Salkeld*, 281; 4 *Sand. Ch. Rep.*, 633; 1 *Wilson*, 170; *McKennon* agt. *Bliss*, 21 *New York*, 206). The evidence before the court requires a finding that the Mohawk river was a navigable river, in fact, for commercial purposes. This conclusion is confirmed by the course of legislation and judicial decisions.

Several cases have arisen in respect to the waters of the Mohawk river, and very much discussion has been had on them in respect to the applicability of the common law of England in respect to navigable streams, and it has been very distinctly held and settled that (1.) " The Mohawk river is a navigable stream, and the title to the bed of the river is in the people of the state." (2.) "Riparian owners along the stream are not entitled to damages for any diversion or use of the waters of the Mohawk by the state" (*The People ex rel. Loomis* agt. *The Canal Appraisers*, 33 *New York*, 461).

Such is the doctrine established by the court of last resort in this state, and the same is not open for cavil or discussion in this court.

The learned counsel for the plaintiff insists that, if it be found that the law has been settled that the people are pro-

prietors of the waters of the Mohawk, having the title thereto, that the same are to be used by them exclusively for purposes of navigation.

That question was raised and presented for discussion and decision in *Commissioners Canal Fund* agt. *Kemshall* (26 *Wendell*, 405), but was not passed upon by the court; though in the opinion delivered by senator VERPLANCK the right to divert the waters, and use them by the state for artificial navigation, was repudiated. But the question has been presented in other cases, and the courts have settled the question adverse to the claim of the plaintiff (*Gould* agt. *H. R. R. Co.*, 2 *Selden*, 522; *The People* agt. *Tibbitts*, 19 *N. Y.*, 527), and at page 528, it is said by the court, "the *state* may, as such proprietor of the waters, grant them or *any interest* in them to an individual. * * It can dispose of them to the exclusion of the riparian owners" (*Page* 528, *opinion of* STRONG, *J.*).

So, too, in *Loomis* agt. *Appraisers* (33 *N. Y.*, *supra*), it appeared that the claim of the riparian owner was based upon an allegation that he was owner by virtue of a grant of the waters of the Mohawk, and that the people, by means of a state dam, had diverted the waters from the current or bed of the natural stream, and conducted them to the Erie canal above the falls, and thus damaged the mill property of the relator; and the court held that the state had a right to thus divert the waters from the river, and by so doing was not liable for injuries sustained by the riparian owner.

Between individuals, the rule would be otherwise; and in the absence of the authority of the legislature no such right of diversion could be exercised without subjecting a party to damages (*Varick* agt. *Smith*, 5 *Paige*, 137; *Clinton* agt. *Myers*, 46 *N. Y.*, 511).

The learned counsel for the plaintiff is correct in saying that the act authorizing the taking of the waters of the Mohawk is local, but the use for which the waters are taken is a public one (§ 462 *of Dillon on M. Corporations*,

*at page* 447; 2 *Johnson's Ch.*, 162; 2 *Denio*, 433; 3 *Selden*, 314; 43 *N. Y.*, 137, *and* 46 *N. Y.*, 550).

It is difficult to see any good reason why the people, if regarded as having the sole right to the use of the waters of a river, and authorized to divert them for purposes of artificial navigation, or to lease them to individuals, may not be equally possessed of the power to authorize them to be taken and applied for the " public use " contemplated by the act authorizing the defendant to construct its water-works and use the waters for supplying its inhabitants with pure and wholesome water.

But the question need not be determined in this action as to the effect of the act of 1872. If the state shall, by the action of its law officer, or otherwise, interfere with the defendant's use of the waters of the Mohawk, for the purposes of its water-works, the question will be more fully before the court (26 *N. Y.*, 297, *and cases there cited*).

If the plaintiff was not the owner of the waters of the Mohawk, or was not entitled, as a matter of right, to their use, at the time the defendant began to divert them, then he has no foundation for this action.

The learned counsel of the plaintiff put in evidence the Oriskany patent, granted April 18th, 1705, commonly known as the " Orsikany patent," granting to the patentee " two miles on each side of the Mohawk, up the stream, from the Oriskany creek to the Oneida carrying path, and thence along the path the same depth into the woods on each side to the swamp Corüngolka, with all the marshes, swamps, ponds, pools, waters, water-courses, rivers, rivulets, runs and streams of water lying and being, or to be enjoyed within the bounds and limits of the parcels and tracts of land aforesaid," and now claims that the conveyance carried to the patentees the bed of the stream of the Oriskany and Mohawk, notwithstanding the Mohawk river was navigable.

He insists that the " English government had full authority to pass the title to a private citizen."

It is to be observed that the Oriskany patent was not granted by the "English government."

It was issued by lord Cornbury, captain-general and governor of the colony of New York.

For the purposes of passing upon the question raised, it may be assumed that he possessed the same and no greater powers than the sovereign of Great Britain. It was not shown by any evidence, nor claimed in the argument of the plaintiff's learned counsel, that the sovereignty acted in issuing, or authorized the issuing of the patent in question.

Did the patent pass the title to the "waters of the Mohawk to private citizens," named as patentees?

The cases already referred to seem to require the question to be answered in the negative.

In considering this question it may be assumed that the governor who issued the patent possessed the same power and prerogative, in respect to the waters of a navigable stream, as the king of the mother country; but the settled distinction between the powers of the sovereign and the powers of the sovereignty must be borne in mind.

The king could only grant so much as he possessed, as was of a private character, or that might be enjoyed so as not to be detrimental to the *jus publicum*, and such parts of his grant as interfered with the *jus publicum* were void. Such a grant did not divest the king, nor invest the grantee from him (*Attorney-General* agt. *Portich*, 10 *Price*, 378 and 412; 8 *Bacon*, *p.* 20–25–28, 29; 4 *Wendell*, 20; *People* agt. *Vanderbilt*, 38 *Barb.*, 286; *and same case affirmed*, 26 *N. Y.*, 287).

In *Martin* agt. *Waddell* (16 *Peters' U. S. R.*, 410), the power of the king to grant rights in navigable streams was under consideration. Chief Justice TANEY says: "From the opinions expressed by the justices of the court of king's bench in the case of *Blundall* agt. *Callerall* (5 *Barn. & Ald. R.*, 287), and under case of the *Duke of Somerset* agt. *Fagwell* (5 *Barn. & Cress.*, 883), the question must be

regarded as settled in England against the right of the king, since *magna charta*, to make such a grant."

He adds that "when the revolution took place, the people of each state became themselves sovereign ; and in *that* character hold *the absolute right* to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the constitution to the general government" (*p.* 410).

The people of this state, acting through their legislature, have never recognized a private ownership of the waters of the Mohawk, by an express enactment; but several acts are found in which the right of the sovereignty over the navigable rivers has been asserted.

In the act passed 5th May, 1786, entitled "An act for the speedy sale of the unappropriated lands within the state," in section 18, it was enacted " that it shall and may be lawful for the said commissioners to grant such and so much of the lands under the water of *navigable* rivers as they shall deem necessary to promote the commerce of the state " (1 *vol. Greenleaf's Ed., p.* 284).

The act authorizing lock navigation within this state, passed 30th March, 1792, and the amendment of December, 1792, was passed by the legislature, and contains clear and positive assumption of title in the state to the Mohawk river.

In the eighteenth section of the original act of March, 1792, under which locks and canals for the Western Inland Lock Navigation Company were constructed in 1795 and 1797, at Little Falls and Rome, there was inserted a provision requiring such works to be constructed, so as " that boats drawing, when loaded, two feet of water, and of the length of forty feet, and of the breadth of twenty feet, may ascend and descend the Mohawk river, in *every* part of the said river between the town of Schenectady and the waters of Wood creek."

The act of March 24, 1791, authorized a survey to be made " of the ground situate between the Mohawk river, at

or near Fort Stanwix, and the Wood creek, and the Hudson river, at the expense of the state " (2 *vol. Greenleaf's Ed.*, 374).

A survey of the river was made, and minute observations taken and reported to the proper state officers in pursuance of that act.    The perusal of the survey and report, and the acts referred to (*supra*), leave no room to doubt that the people of the state thus early asserted title to the waters of the Mohawk river.

The same conclusion is supported by other legislative enactments (*Session Laws of* 1805, *Webster's ed., vol.* 4, *p.* 127; *Laws of* 1823, *pages* 416, *&c.; see Washburn on Easements, p.* 478; *see Laws of* 1817, *p.* 302; *Canal Appraisers* agt. *People,* 17 *Wendell,* 600).

It was said by JOHNSON, J., in *Brown* agt. *Schofield* (8 *Barb.*, 242), " that courts are bound to notice the statute which declares the character of a river in question."    That case also holds, in direct terms, that the common law of England, as to the navigability of streams, has never been adopted in this country (*See page* 443, *and cases cited*).

The state has authorized the construction of feeders, by which some of the waters of the Black river are turned into the Black River canal, the Erie, and some into the Mohawk river, above the point where the defendant takes water from the Mohawk river (*Laws of* 1836, *chapter* 157, § 1).

The plaintiff has no title to the waters of the Black river; the use thereof belongs to the state as the owner thereof, free of any rightful claims thereto by the plaintiff.

The plaintiff claims a right to divert the waters of the Mohawk for the purposes of his mill privilege by means of a dam in the river, and his learned counsel insists that such claim may be sustained by adverse possession and prescription.

The views already expressed lead to the conclusion that the erection of the dam was a nuisance, and the continuance thereof could not, as *against the state*, give the plaintiff or his

grantors a valid claim to maintain the interference with the public waters (*People* agt. *Vanderbilt, supra*).

It is not with the plaintiff to establish a prescription against the state, when the state has the right, and has exercised the right to the use of the waters, as has been already seen (17 *Viner, Prescription,* 6 *page,* 279).

There was no lawful beginning (*Weld* agt. *Hornby,* 7 *East R.,* 198; *Fowler* agt. *Sanders, Croke Jac.,* 446; *Mills* agt. *Hall,* 9 *Wendell,* 315; *Dygert* agt. *Schenk,* 23 *Wendell,* 446; *The People* agt. *Cunningham,* 1 *Duer,* 524; *Washburn on Easements,* 480).

In *People* agt. *Cunningham* (*supra*) there was an obstruction by placing pipes in a public street in the city of Brooklyn, and the party undertook to defend his nuisance upon the public highway by showing a long continuance thereof, and to such an extent as was claimed would legalize it. JEWETT, J., said that "no lapse of time will enable a party to prescribe a nuisance, and that it was immaterial how long the practice had prevailed," p. 536 (*See Taylor* agt. *People,* 6 *Parker Crim. R.,* 352, *Op. of* DANIELS, *J.*).

In *Campbell* agt. *Seaman* (2 *Supreme Court Reports,* 240), POTTER, J., says, whatever may be the rule in England "on the subject of gaming, the right to continue a nuisance by prescription, * * no such rule prevails in this state."

The rule is the same in Massachusetts as in this state (*Commonwealth* agt. *Upton,* 6 *Gray,* 473).

It is suggested by the plaintiff's learned counsel that when the act of 1872 was passed, authorizing the defendant to take the waters of the Mohawk, that the people could not have maintained an action for the use thereof, and section 75 of the Code is relied upon to aid the plaintiff.

That section declares that the people will not sue for or in respect to any real property, unless within forty years the people shall have received the rents and profits of such real property or *some part thereof.* Certainly it cannot be maintained that the state has not used, since its purchase of the

Crill agt. City of Rome.

Inland Lock Co., and the construction of the Erie canal, under the act of 1817, the waters of the Mohawk river, or "some part thereof."

The evidence in this case clearly establishes such use at the city of Rome; the same is true at many other points along the river.

If the plaintiff was the owner of the waters of the Mohawk, or rather had a vested right in them, or the use thereof, so as to enable him to lead them to his mill privilege, his remedy, as he has sought it by an action to restrain the defendant from interfering with such right to use them, would be proper.

In such cases an injunction may now be allowed, in the discretion of the court, before the party has had a trial, in an action at law before a jury (5 *Selden*, 523; 2 *John. Ch.*, 162; *Corning* agt. *Nail Factory*, 40 *N. Y.*, 191, *and S. C.*, 39 *Barb.*; *Pollet* agt. *Long*, 58 *Barb.*, 20–34; 2 *Supreme C. R.*, 240; 19 *Barb.*, 379). But before such injunction can be granted, a party must show that his property, or his right to use property has been interfered with by the defendant.

Having reached the conclusion that the Mohawk is a navigable stream, and that the state has the proprietorship of its waters, and that the title to them is not in the plaintiff, and that he is not entitled to divert the waters from the river, it follows that judgment must be ordered in favor of the defendant, dismissing the plaintiff's complaint with costs.