and verily believes. Carpenter v. Insurance Co., 31 Hun, 78; 2 Rum. Prac. p. 137. It would be very unsafe, on a motion of this kind, to count witnesses on the simple statement of a party to the action that he believes such witnesses are necessary and material. Even if the plaintiff's affidavit was free from serious objection, the motion should still be granted on the merits. The action is brought to recover damages for an alleged breach of a contract relating to huckster privileges at a fair held by the defendant at Cambridge, N. Y. The answering affidavit of plaintiff does not show that he has in Albany county a single witness who has any knowledge of the most important questions involved in the issues presented by the pleadings. He names in his affidavit six witnesses by whom he states he expects to prove that certain space on the grounds was occupied during the fair held by defendant by persons other than the plaintiff. He also names 10 witnesses by whom he states he expects to prove the value of such space, and also the value of the space that he in fact occupied. It is evident that defendant could produce a very large number of witnesses in the immediate neighborhood of the place where the fair was held to give testimony relating to the space occupied by the plaintiff, and its value. In this case the county in which the contract was made, and where all the transactions took place, should control.

Motion granted, with $10 costs, to abide the event of the action.

(39 App. Div. 110.)

### PEOPLE v. PAGE.[1]

#### (Supreme Court, Trial Term, Albany County. April, 1897.)

1. RIPARIAN RIGHTS—BED OF RIVER.
    A colonial grant of land lying along the Mohawk river, a navigable river, made in confirmation of an earlier grant from the Netherlands, will be construed according to the rules of the civil law, and hence the title to the bed of the stream did not pass to the riparian owners, but remained in the state.
2. NAVIGABLE WATERS.
    The fact that a river that is in law a navigable river is not in fact navigable at a particular place does not change its general character, so as to give riparian owners title to the bed of the stream.
3. PUBLIC LANDS—LAND UNDER WATER—APPLICATION FOR GRANT.
    Public Lands Law (1 Rev. St. [9th Ed.] p. 409, § 71) provides that every applicant for a grant of land under water shall, previous to his application, cause notice thereof to be published at least once a week for six weeks successively in a newspaper printed in the county where the land is situated. The defendant did not give any notice of his application for leave to erect and maintain a dam. Held, that a resolution of the commissioners of the land office, giving their consent to the maintenance of a dam, was without authority; and conferred no rights on defendant.
4. RIGHT TO ERECT DAM—CONVEYANCE.
    A right to erect and maintain a dam is an interest in land, and must be conferred by deed.
5. SAME.
    The provision of a resolution of the commissioners of the land office, giving defendant the right to erect a dam across a stream, that the private rights of property of individuals, if any, of every nature and description, shall not be taken away, impaired, or impeded, is a condition of

1 Modified on appeal, 56 N. Y. Supp. 834.

the exercise of the right; and, where such condition has been violated, the resolution will not constitute a defense to an action to abate the dam.

6. NUISANCE—UNAUTHORIZED DAM.

A dam erected and maintained without authority across a stream, the title to the bed of which is in the state, is per se a public nuisance, and may be abated by the state.

Action by the people of the state of New York against Edward N. Page. Judgment for plaintiff.

David Muhlfelder (Edwin Countryman, of counsel), for plaintiff.

Theodore E. Hancock, Atty. Gen. (Hamilton Harris and Marcus T. Hun, of counsel), for the People.

EDWARDS, J. This action is brought to compel the removal of a dam across the southerly sprout of the Mohawk river at Cohoes, which dam was erected in the year 1896 by the defendant, who is the owner of adjacent lands. The question for determination is whether or not the state is the owner of the bed of the Mohawk river at the place in controversy. The learned counsel, in elaborate briefs, have discussed this as an original question. While I have carefully considered it as such, and have examined authorities cited, I am of opinion that it is the settled law of this state that the Mohawk is a navigable river, and the title to the bed thereof is in the people of the state. In People v. Canal Appraisers, 33 N. Y. 461, that doctrine was distinctly affirmed by Judge Davies in a learned opinion, after an exhaustive examination of the authorities. The concurrence in his opinion was unanimous. In that case the relator's title came to him from a patent granted to the Herkimers, in which the boundary on the river is described as follows: "Thence north 60 degrees west to the said Mohawk river; thence down the stream thereof as it runs to the place where the tract began." It was there contended on the part of the relator that the patentees, by virtue of their patent, acquired title to the center of the river. Judge Davies says: "His boundary extending to the said river, and thence down the stream thereof, would necessarily carry him to the thread of the stream, unless the river be of that character which constitutes the state the owner of the bed thereof." The court there held that the Mohawk is a navigable river, to which the doctrine of the civil law is applicable, and that grants to riparian owners did not convey the bed of the stream, but that the title thereof is in the people. In Crill v. City of Rome, 47 How. Prac. 398, Mr. Justice Hardin, referring to that case, says: "Such is the doctrine established by the court of last resort in this state, and the same is not open for cavil or discussion in this court." The case of Smith v. City of Rochester, 92 N. Y. 463, cited by defendant's counsel as in conflict with the doctrine of People v. Canal Appraisers, supra, affirms the doctrine of that case in respect to the Hudson and Mohawk rivers. Chief Judge Ruger, writing the opinion of the court, says (page 482):

"Undoubtedly the leading case on that side in our courts is People v. Canal Appraisers, 33 N. Y. 461, in which the late Judge Davies delivered a learned and elaborate opinion. The headnote shows precisely the questions there involved and the extent of the doctrine announced: 'The Mohawk river is a navigable stream, and the title to the bed of the river is in the people of the state. Riparian owners along the stream are not entitled to damages for any diversion or use of the waters of the Mohawk by the state.' * * * We think

this and similar cases might properly have been decided, for reasons peculiar to the Mohawk and Hudson rivers, upon the grounds stated in Commissioners v. Kempshall, 26 Wend. 404, by Senator Verplanck and by the chancellor and Senator Beardsley in Canal Appraisers v. People, 17 Wend. 572. The titles granted to the original settlers in the Hudson and Mohawk valleys, as construed by the rules of the civil law prevailing in the Netherlands, from whose government they were derived, did not convey to their riparian owners the banks or beds of navigable streams. Upon the surrender of this territory, the guaranty assured by the English authorities to its inhabitants of the peaceable enjoyment of their possessions simply confirmed the right already possessed, and the beds of navigable streams, never having been conveyed, became, by virtue of the right of eminent domain, vested in the English government as ungranted lands, and the state of New York, as a consequence of the Revolution, succeeded to the rights of the mother country. As to the lands under these rivers, the people of this state have, from the earliest times, asserted their title, however acquired, and have assumed to grant and convey them like other unappropriated lands belonging to the state. 3 Greenl. Laws, p. 13 (Dec., 1792); Palmer v. Mulligan, 3 Caines, 308. It is stated in People v. Canal Appraisers, supra, that when the possession of these waters subsequently became necessary to the state, for the purposes of navigation, they reacquired the rights formerly granted by them from the Western Inland Navigation Company by purchase, and they then appropriated them by virtue of their original proprietorship. We think the authority of these cases should be confined to the waters of the Hudson and Mohawk rivers, rights in which were alone necessarily involved in their determination."

In Re Com'rs of State Reservation at Niagara, 37 Hun, 537, Mr. Justice Bradley says (page 546):

"Whether the common-law qualification is applicable to the large rivers in this country has had some consideration by the courts of this state, and produced diverse views in the opinions of jurists. And the conclusion has been reached that the Hudson, beyond tidal influence, and the Mohawk, are navigable, and the state has title to and jurisdiction over them, as effectually as those where tide ebbs and flows. Canal Appraisers v. People, 17 Wend. 571; People v. Canal Appraisers, 33 N. Y. 461. * * * And in the later case of Smith v. City of Rochester, 92 N. Y. 463, the views expressed in the opinion delivered were to the effect that * * * the Hudson above tidal influence, and the Mohawk, are distinguished from other fresh-water rivers by reference to the fact that the early and original settlers along those rivers derived their titles from Holland, where the civil law prevailed."

I think, therefore, it must be regarded as settled that the doctrine of the civil law is applicable to the Hudson and the Mohawk rivers, that the Mohawk is in law a navigable river, and that the title to the bed thereof is in the people of the state. That the Mohawk, at the particular place in controversy, is not in fact navigable, does not change or affect its general legal character as a navigable river and take it out of this doctrine. A river navigable in law does not change its legal character, because at particular localities it is, in fact, nonnavigable. In re State Reservation at Niagara, 16 Abb. N. C. 187, affirmed in 37 Hun, 537. The defendant, therefore, as riparian owner, has no title by implication to the bed of the river, and I think the terms of the grant to his predecessor, under which he claims, do not convey the land under water. It is alleged in the answer that the source of the defendant's title is a grant made by Thomas Dongan, colonial governor, to Killian Van Rensselaer, dated November 4, 1685. This confirmatory patent reads as follows:

"All that and those tract and tracts of land called Ransselaerswyck lyeing and being on and upon the banks of Hudsons river in the county of Albany in

58 N.Y.S.—16

the province of New Yorke aforesaid heretofore called or knowne by the name of the colony of Ranslaerswyck, beginning att the south end or parte of Berrent Island on Hudsons river and extending northwards up along both sides of the said Hudsons river into a place heretofore called the Kahoos or the Great falls of the said river & extending it selfe east and west all along from each side of the said river backwards into the woods twenty-fouer English miles * * * with all and singular the rights, members and appurtenances of the said tract and tracts of land and of every of them, and all and singular the messuages, lands, tenemts., howses, mills, plantacons, buildings, orchards, gardens meadow pastures feedings comons woods underwoods rents arrearages of rent services waifts estrays royaltyes libertyes privilidges jurisdiccons hereditaments and all other the rights members and appurtenances whatsoever to all and every the said tract and tracts of lan & premissess belonging and appurtineing or accepted, reputed, taken, knowne or occupied as parte, parcell or member thereof, togather with all and every the isles, islands, rivers, creeks, runns of waters, mines, mineralls (royll. mines excepted), fishings, fowlings, huntings, hawkings and all other royaltyes, powers, ffranchises, harbours, proffitts, comodityes and haeriditaments whatsoever to the said premissess or any parte thereof belonging or appertaineing."

This grant must be construed in the light of the doctrine of the civil law, and on the principle that every intendment is to be made in favor of the state. It will be observed that the tracts of land conveyed were those "lyeing and being on and upon the banks of Hudson's river." This branch of the Mohawk was undoubtedly supposed at that time to be a part of the Hudson river. The bed of the river was not in express terms conveyed; nor was it within any lands described by metes and bounds. The general clause, "together with all and every the * * * rivers, creeks, runns of water," is insufficient to convey the lands under the waters of the river. It is apparent that this was the view of the court, although not adjudicated when the construction of the terms of the patent was considered in Canal Com'rs v. People, 5 Wend. 423. The confirmatory patent there before the court was the one dated May 20, 1704, from Queen Anne to Killian Van Rensselaer, introduced in evidence in this action, which is confirmatory of the Dongan patent, and contains the same description of the premises conveyed, except that the language there is given as "lying and being in and upon the banks of Hudson's river." "The word 'in' has probably been substituted for 'on.'" Canal Appraisers v. People, 17 Wend. 608. The chancellor, writing the minority opinion, there says:

"The lands lying under the waters of the river are not granted as such in express terms, and therefore, by the rules of the common law, that part which was actually covered by the tide waters did not pass by this grant."

Senator Beardsley, writing the opinion in which the majority concurred, quoting the language of the boundaries of the patent, says:

"It was admitted on the argument that the grant did not include the bed of the river, and the expression 'in and upon the banks of the Hudson river' means nothing more than in the vicinity or upon the Hudson river. But the subsequent terms of description, 'extending northward up along both sides of said river,' render it not only probable, but quite certain, that the bed of the river was not intended to be included."

He further says:

"As a general remark, it will be found correct that the colonial government, as well as the present government of this state, in granting lands on navigable fresh water rivers, and in many instances those not navigable, have studiously

avoided granting the river itself, or the bed of the river, probably anticipating that they might be wanted for public purposes. * * * The result of my reflections is that where patents have been bounded on navigable fresh water rivers in this state, and nothing appears from the grant that the state intended to part with the bed of the river, the patentee shall not, by an implied grant, take the river to the exclusion of the state. For this reason, as well as that the relator has not shown an actual possession, or that the middle sprout was within the bounds of the manor as located, I am for reversing the order of the supreme court."

When that case was again before the supreme court (People v. Canal Appraisers, 13 Wend. 355), the relator claimed to be the owner of the middle sprout, by virtue of a conveyance of the lands under the waters of the sprout. To support his claim, he read in evidence the confirmatory patent of Queen Anne to Killian Van Rensselaer, dated May 20, 1704, and introduced testimony to show a practical or actual location under that grant. The decision of the court in favor of the relator was not based upon his ownership of the bed of the sprout by reason of any express terms of the grant, but upon the principle of the common law that grants of land, bounded upon rivers or streams where the tide does not ebb or flow, carry the right of the grantee to the middle of the stream. When that case was again before the court of errors (Canal Appraisers v. People, 17 Wend. 571), the claim was again made by him that the descriptive words of the patent expressly include the bed of the sprout. Although the court did not adjudicate that question, I think it quite apparent that the members did not entertain that view of the terms of the grant. But the defendant's counsel contend that, assuming the state to have title to the bed of this southerly sprout of the river, the consent of the commissioners of the land office, given January 28, 1897, to maintain the dam as now constructed, is a defense to this action. The introduction into evidence of this consent on the trial was objected to by the plaintiff's counsel, and, as I was not then free from doubt as to its admissibility, it was received in evidence. On examination of the question, I am quite clear that the consent conferred no power on the defendant to erect or to maintain the dam in question. The consent is in the form of a resolution adopted by the commissioners of the land office on the ex parte application of the defendant. A right to erect and maintain a dam is a transfer of an interest in land, and must be by deed. The commissioners of the land office have no power, except such as is conferred upon them by statute, to transfer any interest in the lands of the state. The manner in which they may grant lands under water is prescribed by the statutes of this state, and must be strictly followed. The statute provides:

"Every applicant for a grant of land under water shall, previous to his application, cause notice thereof to be published at least once a week for six weeks successively in a newspaper printed in the county in which the land so intended to be applied for is situated; and a copy of such notice to be posted for the same period upon the door of the court-house of such county, and if there be no court-house in the county, at such place as the commissioners direct." Public Lands Law (1 Rev. St. [9th Ed.] p. 409, § 71).

Such notice is necessary to confer jurisdiction on the commissioners, and without it any grant by them is void. People v. Schermerhorn, 19 Barb. 558. In this case there was an entire omission to give any

notice, and I am of opinion that the consent of the commissioners to maintain the dam was without authority. Furthermore, the said consent contained the following clause: "Provided, furthermore, that private rights and rights of property of individuals, if any, of every nature and description, shall not be taken away, impaired, or impeded." I think that this proviso constituted a condition of the consent; and, as this condition has been violated, as found by the jury, which finding I adopt, the consent, if it ever had any validity, is not a defense.

Having arrived at the conclusion that the title to the bed of the river, on which the defendant's dam is erected, is in the people of the state, and that such dam was erected without authority, it follows that the erection and maintenance of the same is a purpresture, and per se a public nuisance, and should be abated. People v. Vanderbilt, 26 N. Y. 287.

---

(40 App. Div. 465.)

AMES v. MANHATTAN LIFE INS. CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department. May 19, 1899.)

1. LIFE INSURANCE—WAIVER OF CONDITIONS.
    A stipulation in the application that a policy shall not go into effect unless the insured is in good health when delivered and the first premium paid is waived by a general agent's acceptance of the premium and delivery of the policy after being informed of the illness of the insured.

2. SAME—APPLICATION—QUESTION FOR JURY.
    An application for an ordinary life policy was declined, without a further physical examination, to which the applicant refused to submit. A witness testified that on further negotiation the company's agent offered the insured an incontestible 20-year life policy, free from all conditions except the payment of larger premiums, but the agent denied that he offered it in that form. The 20-year life policy which was issued to and accepted by insured, distinctly referred to an application and the statements and covenants it contained; and the conditions indorsed on the policy explicitly referred to such statements, though these references were in the usual printed formula. *Held*, that whether the subsequent negotiation resulting in the issuance and acceptance of this policy was understood to be based on the original application was for the jury.

3. SAME—PLEADING—BREACH OF WARRANTY AND FRAUD.
    In an action on a policy, an answer averring that statements in the application were false and fraudulent is sufficient to raise both the questions of a breach of warranty and fraud.

4. SAME—APPLICATION—WARRANTY—CONSTRUCTION.
    Where an applicant warranted that the statements and answers made in his application were "full, complete, and true in every particular," he only warranted those answers which reasonably bear the construction of strict warranties, and not those which on their face merely import honest representations, made truthfully to the best of his knowledge, information, and belief.

5. SAME—TRUTHFUL ANSWER—CHANGE BY MEDICAL EXAMINER.
    Where insured gave a truthful answer to a question put by the insurer's medical examiner, and the latter wrote an untruthful answer, which the insured did not see, the insurer, and not the insured, is responsible for the falsehood.

6. SAME—ANSWER TO GENERAL QUESTION.
    Where an applicant is asked generally as to diseases of the genital or urinary organs, other than several which were specially inquired about,